**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

AMERICAN WHITEWATER,  )
                      )
            Petitioner,  )
                      )
v.                    )
                      )    No. ___23-1291___
                      )
FEDERAL ENERGY REGULATORY  )
COMMISSION,           )
                      )
            Respondent.  )
_____

**PETITION FOR REVIEW**

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), Federal Rule of

Appellate Procedure 15(a), and D.C. Circuit Rule 15(a), American Whitewater hereby petitions

this Court for review of the following orders issued by the Federal Energy Regulatory

Commission ("FERC" or "Commission"), Respondent:

> • *Aclara Meters, LLC*, Order Approving Surrender of License, Project No. 3820-012, 183
> FERC ¶ 62,095 (issued May 22, 2023) ("Surrender Order");

> • *Aclara Meters, LLC*, Notice of Denial of Rehearing by Operation of Law and Providing
> for Further Consideration, Project No. 3820-012, 184 FERC ¶ 62,047 (issued July 21,
> 2023) ("Rehearing Denial"); and

> • *Aclara Meters, LLC*, Order Addressing Arguments Raised on Rehearing, Project No.
> 3820-012, 184 FERC ¶ 61,183 (Issued September 21, 2023) ("Rehearing Order").

The Surrender Order is attached as Attachment A, the Rehearing Denial is attached as

Attachment B, and the Rehearing Order is attached as Attachment C.

Aclara Meters, LLC ("Aclara") currently holds a license issued by the Federal Energy

Regulatory Commission for the Somersworth Hydroelectric Project, FERC Project No. 3820,

("Project") on the Salmon Falls River, which forms the border between New Hampshire and

Maine. In 2011, the Project became non-operational following a failure of the penstock that delivered water to the powerhouse. Despite this, in 2016, with its FERC license approaching expiration, Aclara initiated the process to obtain a new license so it could continue to operate the Project, pending its repair.

Subsequently, Aclara decided to retire, or decommission, the Project rather than obtain a new license to continue to operate the project and repair the penstock, and on March 29, 2019, it submitted an application to FERC for the surrender of its license, a prerequisite step to decommissioning a FERC-licensed hydroelectric project. Surrendering its project license also avoided the potential expense of installing fish passage at the project. In its surrender plan, Aclara proposed to leave the Project's two dams, Stone Dam and Back Dam, in the Salmon Falls River rather than remove them. This plan would result in two unused dams remaining in the river, obstructing fish passage and having a negative impact on recreation.

American Whitewater, as well as various resource agencies and stakeholder groups advocated for FERC's consideration of an alternative surrender plan that would remove both dams from the river. Specifically, in response to FERC's Environmental Assessment for the license surrender action, American Whitewater, United States Fish & Wildlife Service, Maine Department of Inland Fisheries and Wildlife, Maine Department of Environmental Protection, New Hampshire Fish and Game Department, Trout Unlimited's Sebago Lake Chapter, and Trout Unlimited's Great Bay Chapter all filed comments that supported consideration of a dam removal alternative due to the impact of project dams on diadromous and resident fish species and river connectivity. American Whitewater also sought consideration of dam removal due to the impacts to river recreation caused by leaving the unused dams in the river.

Notwithstanding these comments by state and federal resource agencies and non-governmental organization stakeholders supporting consideration of a dam removal alternative, FERC issued its Surrender Order on May 22, 2023, approving Aclara's surrender plan.

On June 20, 2023, American Whitewater sought timely rehearing of FERC's Surrender Order based on the following issues:

1. Did the Commission err in failing to determine that dam removal is in the public interest?
2. Did the Commission err by arbitrarily and capriciously rejecting the dam removal alternative?
3. Did the Commission err by failing to comply with Section 401(a)(1) of the Clean Water Act?

FERC did not substantively respond to American Whitewater's June 20 Request for Rehearing within 30 days, and on July 21, 2023, FERC issued a Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration. The Rehearing Denial indicated that in the absence of FERC action within 30 days from the date a request for rehearing is filed, the request for rehearing may be deemed to be denied by operation of law under 16 U.S.C. § 825l(a), 18 C.F.R. § 385.713, and this Court's decision in Allegheny Defense Project v. FERC, 964 F.3d 1 (D.C. Cir. 2020). The Rehearing Denial also stated that FERC would address the arguments raised in the rehearing request in a future order. FERC did so on September 21, 2023 in its Rehearing Order, affirming its original Surrender Order that approved Aclara's surrender plan without requiring dam removal.

FERC uses a broad public interest standard to ensure the orderly transition from FERC relicensing of hydropower projects to project decommissioning. This standard is derived from governing statute (16 USC § 799) and regulations (18 CFR §§ 6.1 and 6.2), as articulated in the

Commission's *Project Decommissioning at Relicensing; Policy Statement* (hereinafter, "Decommissioning Policy Statement"). FERC's Decommissioning Policy Statement states:

> The Commission is of the opinion that implicit in the section 6 surrender provision is the view that a licensee ought not to be able simply to walk away from a Commission-licensed project without any Commission consideration of the various public interests that might be implicated by that step. Rather, the Commission should be able to take appropriate steps that will satisfactorily protect the public interests involved.[1]

<u>See</u>, *Erie Boulevard Hydropower, L.P., Saint Regis Mohawk Tribe,* 155 FERC P62,243, 64,628 (2016), citing *Arizona Pub. Serv. Co.,* 109 FERC P 61,036 at p 34 (2004).

Under the Federal Power Act, FERC's factual findings underlying its orders must be "supported by substantial evidence." 16 U.S.C. § 825*l*(b). The FERC record includes extensive comments filed by federal and state resource agencies and other stakeholders making clear that retaining the Project's dams will completely block fish passage on the Salmon Falls River, preventing attainment of restoration goals for shad and blueback herring on the Salmon Falls River and permanently blocking access to nine river miles of habitat upstream of the Project. Additionally, American Whitewater filed comments in the FERC record that indicate that retaining the dams will negatively impact the safety of boaters, tubers, and swimmers, all of whom can easily drown where recirculating currents at the dams can prevent escape. Without meaningful analysis, FERC ignored these ongoing impacts, and its Surrender Order lacks substantial evidence to support its rejection of a dam removal alternative.

Consequently, the Commission's Surrender Order is unsupported by substantial evidence and is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

[1] *Project Decommissioning at Relicensing; Policy Statement*, 60 Fed. Reg. 339 (Jan. 4, 1995), 18 C.F.R. § 2.24.

law," in violation of the Administrative Procedure Act. 5 U.S.C. §§ 706(2)(A). See, also, *Bangor Hydro-Electric Co. v. FERC,* 78 F.3d 659, 663 & n. 3 (D.C. Cir. 1996).

Additionally, Section 401(a)(1) of the Clean Water Act stipulates that any applicant for a federal license or permit to conduct "any activity…which may result in any discharge into the navigable waters" must obtain a water quality certification from the state or Tribe in which the discharge originates, ensuring that the discharge will comply with various provisions of the Clean Water Act. In issuing its Surrender Order, the Commission failed to consider whether the continued discharges from the two unused dams and an associated canal diversion following license surrender would trigger the requirement for the states of Maine and New Hampshire to issue a water quality certification pursuant to Section 401.

In addressing American Whitewaters arguments raised on rehearing, the Commission concluded that no Section 401 water quality certification was required because the Surrender Order does not authorize a "new discharge" but rather allows for the continuation of an existing discharge allowed under the FERC license being surrendered. FERC's conclusion is flawed because it incorrectly uses the Project's existing discharges allowed under the FERC license as the baseline for determining whether there will be a discharge following surrender that would trigger the need for a new Section 401 certification. FERC's analysis fails to consider that, following surrender, Aclara's ongoing diversion of flow from the Salmon Falls River through a fill gate to rewater the power canal to provide processing water for its manufacturing operations, and the requirement that Aclara maintain its current bypass gate and a minimum flow of 10 cubic feet per second, is a discharge triggering Section 401. Nothing in Section 401 supports FERC's conclusion that Section 401 applies only to new discharges, and the Surrender Order fails to cite

to any authority that limits the applicability of Section 401 only to new discharges. See, *S.D. Warren v. Maine Board of Environmental Protection Agency et al,* 547 U.S 370 (2006).

Should FERC's interpretation that Section 401 is not applicable when authorizing actions that involve continuing discharges be allowed to prevail, it would profoundly limit the ability of states to ensure that federally-licensed hydropower projects meet state water quality requirements. FERC's narrow interpretation of Section 401 means that the vast majority of hydropower projects would not require Section 401 water quality certification when they are relicensed for continuing operations or when their licenses are surrendered, even if discharges continue.

Conclusion

American Whitewater contends that in issuing its September 21, 2023 Order Addressing Arguments Raised on Rehearing, FERC erred in determining that its Surrender Order was in the public interest. Its decision is not supported by substantial evidence in the record and, consequently, it is arbitrary and capricious, in violation of the Administrative Procedure Act. Additionally, the Surrender Order violates the Clean Water Act's Section 401(a)(1) requirement that "[n]o license or permit shall be granted until the certification required by this section has been obtained or has been waived…." The Commission violated Section 401(a)(1) in issuing its Surrender Order without certification or waiver from the states of Maine and New Hampshire as required by the Clean Water Act.

American Whitewater seeks an Order from this Court vacating FERC's Order Addressing Arguments Raised on Rehearing and Order Approving Surrender of License, remanding to the Commission for further consideration of a dam removal alternative and compliance with Section 401(a)(1) of the Clean Water Act.

Respectfully submitted,

DATED: October 23, 2023

/s/ Robert A. Nasdor
Robert A. Nasdor
Northeast Stewardship & Legal Director
AMERICAN WHITEWATER
65 Blueberry Hill Lane
Sudbury, Massachusetts 01776
(617) 584-4566
bob@americanwhitewater.org

*Counsel for American Whitewater*

Enclosed:

Attachment A: Surrender Order
Attachment B: Rehearing Denial
Attachment C: Rehearing Order
Attachment D: Request for Rehearing
Attachment E: Service List

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| AMERICAN WHITEWATER, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| FEDERAL ENERGY REGULATORY | ) | |
| COMMISSION, | ) | |
| Respondent. | ) | |
| _____ | ) | |

**RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to District of Columbia Circuit Rules 27(a)(4) and 26.1, the undersigned counsel for

American Whitewater discloses that American Whitewater is a non-profit corporation organized

under the laws of the State of Missouri. American Whitewater does not have a parent corporation

and is not publicly held.

|  |  |
|---|---|
| | Respectfully submitted, |
| DATED: October 23, 2023 | /s/ Robert A. Nasdor _____ |
| | Robert A. Nasdor |
| | Northeast Stewardship & Legal Director |
| | AMERICAN WHITEWATER |
| | 65 Blueberry Hill Lane |
| | Sudbury, Massachusetts 01776 |
| | (617) 584-4566 |
| | bob@americanwhitewater.org |
| | |
| | _Counsel for American Whitewater_ |

8

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

AMERICAN WHITEWATER,

Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

Respondent.

_____

No. _____

## CERTIFICATE OF SERVICE

Pursuant to Rule 15(c) and Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have on this day served a copy of the foregoing documents upon the Solicitor of the Federal Energy Regulatory Commission ("FERC") and the FERC Secretary at the addresses provided below, and upon each person designated on the official service list maintained by FERC for Project No. 3820, which service list is attached to this Petition as Attachment E.

| | |
|---|---|
| Robert H. Solomon, Solicitor<br>Federal Energy Regulatory Commission<br>888 First Street, NE<br>Washington, DC 20426 | Kimberly D. Bose, Secretary<br>Federal Energy Regulatory Commission<br>888 First Street, NE<br>Washington, DC 20426 |

Respectfully submitted,

DATED: October 23, 2023

/s/ Robert A. Nasdor
Robert A. Nasdor
Northeast Stewardship & Legal Director
AMERICAN WHITEWATER
65 Blueberry Hill Lane
Sudbury, Massachusetts 01776
(617) 584-4566
bob@americanwhitewater.org

_Counsel for American Whitewater_

**Attachment A: Surrender Order**

183 FERC ¶ 62,095
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Aclara Meters, LLC                                    Project No.  3820-012

ORDER APPROVING SURRENDER OF LICENSE

(Issued May 22, 2023)

1.      On March 29, 2019,[1] Aclara Meters, LLC (Aclara) filed an application to
surrender the license for the Somersworth Hydroelectric Project No. 3820 (Somersworth
Project).  The project is located on the Salmon Falls River in Strafford County, New
Hampshire, and York County, Maine.  For the reasons discussed below, this order
approves the surrender of the Somersworth Project license, subject to the terms and
conditions discussed below.[2]

I.      **Background**

2.      On September 29, 1981, General Electric Company was issued a license for the
2.2-megawatt (MW) Somersworth Hydroelectric Project No. 3820.[3]  The license expired

---

[1] On March 24, 2022, and May 3, 2023, the licensee filed a supplement to its
application, requesting the Commission expeditiously act on its application.

[2] A licensee requests surrender of a Commission-issued license when it decides it
no longer wishes to hold that license, which can happen for a variety of reasons.  To
protect the environment and public, a license may only be voluntarily surrendered upon
agreement between the licensee and the Commission.  When a licensee voluntarily
decides to surrender its license, the Commission's regulations require the licensee to file
a surrender application that includes a decommissioning plan.  18 C.F.R. § 6.1 (2022).
Possible forms of decommissioning range from simply shutting down the power
operations to removing all parts of the project, including the dam, and restoring the site to
its pre-project condition.  The Commission will only approve a license surrender once the
licensee has fulfilled its obligations under the license or as established by the
Commission.  *See Project Decommissioning at Relicensing*, FERC Stats. & Regs.
¶ 31,011 (1994) (cross-referenced at 69 FERC ¶ 61,336).

[3] *Gen. Elec. Co.,* 16 FERC ¶ 62,598 (1981) (order issuing minor license); *Gen.
Elec. Co.,* 40 FERC ¶ 62,196 (1987) (order amending license to increase the total

on August 31, 2021, and since then, the project has been authorized to continue operation pursuant to section 16.18 of the Commission's regulations,[4] pending the Commission's review of the surrender application.  The project has not, however, generated power since June 2011 due to a penstock failure.

3.      The licensee initiated relicensing of the project by filing with the Commission a pre-application document (PAD) and Notice of Intent (NOI) on August 31, 2016, as required by Commission regulations.[5]  Upon review of comments and study requests associated with relicensing the project, the licensee determined that the cost to rehabilitate the project, combined with the cost of obtaining a new license and implementing any new license requirements, makes the project uneconomic.  Therefore, on March 29, 2019, Aclara filed an application to surrender the project.

4.      On April 26, 2019, the Commission issued notice soliciting potential new applicants for the project, and New Hampshire Renewable Resources, LLC (New Hampshire Renewable) filed a timely NOI for the project.  Subsequently, on August 13, 2020, New Hampshire Renewable withdrew its application,[6] and Commission staff proceeded with review of Aclara's surrender application.

## II.     Project Description

5.      The Somersworth Project includes:  (1) a 400-foot-long and 16.5-foot-high stone gravity structure known as Stone Dam; (2) a gatehouse with four intake gates and a fill gate leading to the power canal; (3) a 1,600-foot-long, 15-foot deep, and 20-foot wide power canal, constructed of granite block and stone; (4) a 600-foot long, 10-foot-diameter penstock; (5) a trashrack at the bypass gate;[7] (6) a powerhouse containing two turbines (1,500 kW and 500 kW) with a hydraulic capacity of 40-460 cubic feet per second (cfs); (7) a 107-foot-long and 19-foot-high Back Dam, located at the terminus of the bypassed

---

licensed capacity from 1.5 MW to 2.2 MW by installing one additional turbine-generator).

[4] *See* Notice of Authorization for Continued Operation (Sept. 14, 2021).

[5] 18 C.F.R. §§ 5.5(a), 5.6(a)(1) (2022).

[6] See Commission staff's letter dated August 20, 2020.

[7] The trashrack prevents debris from accumulating at the entrance or base of the spillway and becoming an entrainment issue for migrating aquatic species.

reach and adjacent to the powerhouse; and (8) appurtenant works.[8]  The project is classified as having a significant hazard potential.

6.      The project operates in a run-of-river mode, as required by Article 401 of the license, as amended.[9]  Article 26 of the license requires the release of 10 cfs from Stone Dam into the bypassed reach.

7.      Back and Stone Dams are the fourth and fifth dams on the Salmon Falls River, respectively.  Downstream of the Somersworth Project are three other Commission-licensed projects (looking downstream):  Lower Great Falls Hydroelectric Project No. 4451, the Rollinsford Hydroelectric Project No. 3777, and the South Berwick Hydroelectric Project No. 11163.  Approximately 9 miles upstream is the Boston Felt Project No. 4542, an exemption under the Commission's jurisdiction.

## III.    Proposed Surrender

8.      To effectuate the surrender of the project license, Aclara proposes to:  (1) leave the cofferdam in place at the forebay, just prior to the entrance to the trashrack and penstock; (2) remove the trashrack and gear leading to the penstock and install stoplogs; (3) disconnect the power supply to the forebay at the power source located on Aclara's premises; (4) fill the forebay with sand and backfill material; (5) fill the penstock with sand; (6) remove all hydraulic fluids from the powerhouse; (7) disconnect the generator and switch gear; (8) remove all electrical equipment (i.e., cabinets) from the powerhouse; and (9) close all gates at the gatehouse, except for the 2 foot by 2 foot fill gate which is used to re-water the power canal, and would provide Aclara's processing water for its manufacturing operations (approximately 25,000-30,000 gallons per day or 0.05 cfs).

9.      Following surrender, the licensee proposes to continue passing all inflow over the Stone Dam's spillway crest or through the bypass gate, which is set at an opening that maintains the required 10 cfs minimum flow in the bypassed reach,[10] except for approximately 0.05 cfs released into the canal for Aclara.  The licensee also proposes to maintain vegetation control along the canal.

---

[8] Application at 2-3; *Gen. Elec. Co.,* 40 FERC ¶ 62,196 (1987); *Gen. Elec. Co.,* 16 FERC ¶ 62,598 (1981).

[9] *Gen. Elec. Co.*, 40 FERC ¶ 62,196, at 63,315 (1987).

[10] The invert of this gate is below the crest of Stone Dam.  Except for the licensee's 0.05 cfs processing water released into the canal, most inflow would pass over the Stone Dam's spillway upon surrender so flows released into the bypassed reach would be much higher than 10 cfs and would approximate inflow.

10.     The licensee proposes no major modifications to project dams, buildings, or structures, and no ground disturbing activities are proposed.  Aclara indicates that it would engage with the City of Somersworth, New Hampshire (City), and the Town of Berwick, Maine, to pursue the sale of Stone Dam.

## IV.    Pre-filing Consultation and Public Notice

11.     In the application, the licensee provided documentation of consultation with federal and state resource agencies, as well as several non-governmental organizations, municipalities, and Tribes.

12.     The New Hampshire Fish and Game Department (New Hampshire FGD) suggested that surrender of the project will adversely affect efforts to improve diadromous fish passage, noting that when relicensing efforts began, it expressed a desire to remove Stone and Back Dams, or alternatively install fish and eel passage at the project.[11]  New Hampshire FGD also raised questions regarding how the project would operate post-surrender and indicated that jurisdiction of the project would fall to the New Hampshire Department of Environmental Services (New Hampshire DES).

13.     American Whitewater expressed concern that the licensee proposes to leave the dams in place upon surrender, allowing adverse impacts associated with river connectivity, sediment transport, and water quality to continue.  American Whitewater suggested that any sale of Stone Dam would allow the licensee to profit from the sale of an obsolete structure and shift liability to local taxpayers.  American Whitewater stated that the licensee should address fish passage if the project is surrendered and recommended the removal of Back Dam because it creates a hazard to recreationists and removal would create an opportunity for whitewater recreation in the bypassed reach.

14.     The City stated that the project reservoir is its source of water supply and that its water treatment plant, as well as two bridges upstream, would be negatively impacted by any changes in impoundment levels.  The City also indicated that the project reservoir is used for fire suppression efforts.  The licensee included a response to these comments in Appendix D of the application.[12]

15.     The Commission issued public notice of the surrender application on September 11, 2019, with protests, comments, and motions to intervene due by October

---

[11] New Hampshire FGD February 9, 2021 Comments.  The Maine Department of Marine Resources, U.S. Fish and Wildlife Service (FWS) and the Coastal Conservation Association of New Hampshire (CCA of New Hampshire) echoed these concerns.

[12] Application, app. D.

11, 2019.[13]  The City and American Whitewater filed timely motions to intervene.  FWS, New Hampshire DES, and New Hampshire FGD filed comments.  On October 15, 2020, the licensee filed an answer to the comments.

16.     New Hampshire FGD, New Hampshire DES, and FWS state they support the surrender of the project, but reiterate many of the concerns identified in pre-filing consultation.  Commenters continue to recommend construction of fish passage structures or dam removal to provide safe, timely, and effective passage for migratory and riverine fish in the Salmon Falls River.[14]

17.     The New Hampshire DES and FWS recommend the licensee permanently seal the penstock, instead of filling with sand, and install grating (with spacing acceptable to resource agencies) over the 2 foot by 2 foot fill gate to prevent aquatic life from being trapped in the canal.[15]  New Hampshire DES also recommends that the licensee develop and implement an operation and maintenance plan for the decommissioned facilities that includes, but is not limited to, regular inspection and maintenance of all gates, trash racks, and the canals.[16]

18.     Although not objecting to the surrender of the project license, American Whitewater states that the proposal is not in the public interest because it would not sufficiently restore the river to its natural condition and would continue to adversely impact recreation potential on the Salmon Falls River.[17]  Specifically, American Whitewater mentions the dangerous hazards that exist because of the Back Dam's presence in the river and that there are no practical means of portage around the dams. American Whitewater recommends removal of the Back Dam, and other project works that are an impediment to future recreational use.[18]

19.     The City reiterates that the project reservoir serves as its and the Town of Berwick, Maine's water supply.  According to the City, any changes to reservoir

---

[13] 84 Fed. Reg. 48,922 (Sep. 17, 2022).

[14] FWS October 10, 2019 Comments at 2; New Hampshire DES October 10, 2019 Comments at 3; New Hampshire FGD October 10, 2019 Comments at 1.

[15] FWS October 10, 2019 Comments at 2; New Hampshire DES October 10, 2019 Comments at 3.

[16]  New Hampshire DES October 10, 2019 Comments at 3.

[17] American Whitewater September 27, 2019 Motion to Intervene at 1.

[18] *Id.* at 3.

elevations could adversely affect its water treatment plant, fire suppression efforts, and bridge infrastructure.[19]

20.     In its response, the licensee states that a surrender proceeding is not the proper forum for resource agencies and stakeholders to seek significant changes to infrastructure or capital investment of new facilities.[20]  The licensee states that it has decided to surrender the project license because making such investments is not economically feasible.  The comments and the licensee's answer are addressed below.

## V.     Statutory Compliance

### A.     Threatened and Endangered Species

21.     Section 7(a)(2) of the Endangered Species Act (ESA)[21] requires federal agencies to ensure their actions are not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of the critical habitat of such species.

22.     No listed species have been identified by the resource agencies that may be affected by surrender of the project.  According to the licensee's PAD, filed on August 31, 2016, the following listed species may potentially be in the project area:  red knot (*Calidris canutus rufa*), roseate tern (*Sterna dougallii dougallii*), piping plover (*Charadrium melodus*), small whorled pogonia (*Isotria medeoloides*), northern long-eared bat (*Myotis septentrionalis*), Hawksbill sea turtle (*Eretmochelys imbricata*), and leatherback sea turtle (*Dermochelys coriacea*).  Based on the FWS's Information for Planning and Consultation website,[22] Commission staff identified one federally listed species (northern long-eared bat) and one candidate species (monarch butterfly) that may be in the project area.[23]  No ground disturbing activities or tree cutting is associated with

---

[19] City October 9, 2019 Motion to Intervene at 1.

[20] Aclara October 15, 2019 Answer at 4-5.

[21] 16 U.S.C. § 1536(a).

[22] *IPaC,* FWS, https://ipac.ecosphere.fws.gov/ (accessed June 6, 2022).

[23] FWS published a final rule that went into effect on March 31, 2023, reclassifying the northern long-eared bat as endangered under the ESA.  87 Fed. Reg. 73,488 (Nov. 29, 2022); *see* 88 Fed. Reg. 4908 (Jan. 26, 2023).  This new rule does not affect Commission staff's conclusion that the proposed surrender would have no effect on the listed species.

surrender of the project. Therefore, Commission staff conclude that approving the proposed surrender would have no effect on this listed species.

## B.   National Historic Preservation Act

23.     Under section 106 of the National Historic Preservation Act (NHPA)[24] and its implementing regulations,[25] federal agencies must take into account the effect of any proposed undertaking on properties listed or eligible for listing in the National Register of Historic Places (National Register), defined as historic properties, and afford the Advisory Council on Historic Preservation (Advisory Council) a reasonable opportunity to comment on the undertaking. This generally requires the Commission to consult with the State Historic Preservation Officer (SHPO) to determine whether and how a proposed action may affect historic properties, and to seek ways to avoid or minimize any adverse effects.

24.     By letter dated November 12, 2018, the licensee notified the SHPOs, Tribes, and other interested parties of the proposed surrender.[26] In response, the Maine State Historic Preservation Commission (Maine SHPO) indicated that no effect to historic properties would result from surrender of the project.

25.     The eligibility for listing the project features[27] on the National Register has not been determined. Construction of Stone Dam was complete in 1929,[28] and generation was added to the site in the 1980s. Based on the age of certain project features, Commission staff determined that they may be eligible for listing. Therefore, staff concluded that the proposed surrender would adversely affect those potentially historic project features because of a loss of federal jurisdiction.

26.     By letter dated February 27, 2020, Commission staff provided our determination of adverse effect to the New Hampshire Division of Historical Resources (New Hampshire SHPO).[29] Since no modifications to project features or ground disturbance

---

[24] 54 U.S.C. § 306108.

[25] 36 C.F.R. § 800 (2022).

[26] Aclara November 12, 2018 Letter.

[27] In this case, the entire project within the project boundary is considered the Area of Potential Effect (APE).

[28] Commission staff do not have records for when construction of Back Dam was completed.

[29] Commission staff February 27, 2020 Letter.

would occur with the proposed surrender, we recommended no mitigation for this adverse effect.

27.    In correspondence filed March 23, 2020, the New Hampshire SHPO stated that additional information was needed for review because a potential adverse effect may be caused by "demolition by neglect" if the project features are no longer maintained.[30]  The New Hampshire SHPO requested the preparation of a New Hampshire Inventory form for the property, prepared by a qualified architectural historian to determine National Register eligibility.

28.    On April 24, 2020, Commission staff issued a letter disagreeing with the New Hampshire SHPO's findings and requesting comments from the Advisory Council.[31]  In a letter filed on July 31, 2020, the Advisory Council agreed with Commission staff's assessment that demolition by neglect does not appear to be reasonably foreseeable in this case and suggested that a license surrender would not be, in and of itself, an adverse effect to historic properties.[32]  Thus, consultation under Section 106 of the NHPA is complete.

## VI.    **Environmental Analysis**

29.    To satisfy the requirements of the National Environmental Policy Act (NEPA), Commission staff issued an environmental assessment (EA) on January 6, 2021.  The EA evaluated the potential environmental effects of the proposal and any recommended measures to minimize any potential effects.  Since no ground disturbance is proposed, the EA found that the proposal would have no effects on geology and soils, water quantity, water quality, and terrestrial resources (including wildlife and botanical resources).[33]  The EA also found that the proposed surrender would have no effect on fisheries or recreation.[34]

---

[30] New Hampshire SHPO March 23, 2020 Letter.

[31] Additional background information was provided to the Advisory Council by email on May 8, 2020.  The Advisory Council's request, and the information provided, was described in Commission staff's memo, filed on May 14, 2020.

[32] Advisory Council July 31, 2020 Letter.  The Advisory Council also suggested that a license surrender may not constitute a transfer of property out of federal control as identified in 36 C.F.R. § 800.5(a)(2)(vii).

[33] EA at 9.

[34] *Id.* at 8, 16.  However, the EA acknowledged that if fish passage facilities are

30.    The Maine Department of Environmental Protection (Maine DEP), Maine Department of Inland Fisheries and Wildlife (Maine DIFW), New Hampshire FGD, FWS, Sebago Chapter of Trout Unlimited (Sebago TU), Great Bay Chapter of Trout Unlimited (Great Bay TU), and American Whitewater filed comments on the EA.  The licensee filed a response to the comments.  The comments and response are addressed below.

### A.    Need for a Final EA

31.    Commenters recommend that the Commission issue a final EA to evaluate dam removal and fish passages as alternatives to the proposed action.[35]  FWS further requests that a final EA evaluate whether dam removal or breach alternatives would be problematic for the municipalities' water supply, and whether impacts from those alternatives could be mitigated.[36]  These comments have been fully considered in the review of this proceeding and are addressed in this order, therefore the issuance of a final EA to address these comments is not necessary.

### B.    Consideration of Dam Removal and Fish Passage

32.    In comments on the EA, resource agencies, American Whitewater, Sebago TU, and Great Lakes TU contend that Commission staff did not adequately consider the dam removal alternative or the installation of fish passage facilities.  Commenters assert that dam removal would have benefits for anadromous and resident fish, as well as recreation.[37]

---

installed at the two Commission-licensed projects immediately downstream of the Somersworth Project (Lower Great Falls Hydroelectric Project No. 4451 and the Rollinsford Hydroelectric Project No. 3777), the project dams would continue to block passage of diadromous species.  *Id.* at 16.

[35] New Hampshire FGD February 9, 2021 Comments at 2; FWS February 5, 2021 Comments at 2; Maine DEP February 5, 2021 Comments at 2; Maine DIFW February 5, 2021 Comments at 1.

[36] FWS February 5, 2021 Comments at 2.

[37] New Hampshire FGD February 9, 2021 Comments at 2; Great Lakes TU February 9, 2021 Comments at 1; American Whitewater February 8, 2021 Comments at 3-4; FWS February 5, 2021 Comments at 2; Maine DEP February 5, 2021 Comments at 2; Maine DIFW February 5, 2021 Comments at 1; Sebago TU February 5, 2021 Comments at 1.

33.    Specifically, commenters explain that fish passage will likely be required in the relicensing of two Commission-licensed projects below Somersworth, i.e., the Rollinsford Hydroelectric Project No. 3777 and the Lower Great Falls Hydroelectric Project No. 4451,[38] and anticipate anadromous fish runs will reach the Somersworth Project in the reasonably foreseeable future.  FWS notes that removal of the passage barriers at the Somersworth Project would provide access to habitat up to the Boston Felt Hydroelectric Project No. 4542, approximately 9 miles upstream, tripling the accessible habitat and providing 192 acres of habitat for priority 'at-risk' species in the Salmon Falls River.[39]  New Hampshire FGD states that the 2020 New Hampshire Atlantic States Marine Fisheries Commission River Herring Sustainable Fishing identifies the current status, sustainability targets, adaptive management strategies, and descriptions of the fishery in the Great Bay Estuary.  New Hampshire FGD states that it has worked to restore runs of migratory fish to the Salmon Falls River watershed since 1994 and reiterates that the Commission should consider dam removal or fish passage prescriptions as alternatives to the proposed action.[40]  Commenters also conclude that the EA failed to consider potential benefits to resident fish because of increased connectivity and available habitat should dam removal occur.[41]

34.    With respect to recreation, American Whitewater argues that the Salmon Falls River in the project area has the potential to offer whitewater paddling opportunities if the dams are removed.[42]  Regarding Back Dam, American Whitewater states the structure is obsolete and eliminates the possibility of recreational activities on the river because it creates hazardous conditions and forms a complete obstruction with no practical means of portage.[43]  American Whitewater refers to two Commission-licensed projects, the Dillsboro Hydroelectric Project No. 2602 and the Sullivan Creek Project No. 2225, where

---

[38] Since issuance of the EA, the Commission did act on the license applications for these two downstream projects.  See *Town of Rollinsford, New Hampshire,* 179 FERC ¶ 61,203 (2022) and *Green Mountain Power Corporation and City of Somersworth, New Hampshire,* 182 FERC ¶ 61,024 (2023), respectively.  The lowermost project on the river, the South Berwick Hydroelectric Project No. 11163, has operational upstream and downstream fish passage facilities.

[39] FWS February 5, 2021 Comments at 2.

[40] New Hampshire FGD Comments at 1.

[41] *See, e.g.,* Great Lakes TU February 9, 2021 Comments at 1; Sebago TU February 5, 2021 Comments at 1; Maine DIFW February 5, 2021 Comments at 1.

[42] American Whitewater February 8, 2021 Comments at 1.

[43] *Id.* at 2-3.

significant whitewater recreation issues were resolved by dam removal by the Commission at surrender.[44]  American Whitewater recommends that the Commission should require the licensee prepare a comprehensive decommissioning plan in coordination with the stakeholders that will restore recreation opportunities and environmental benefits within the project boundary.[45]  Further, American Whitewater suggests that the licensee's plan to sell the upper Stone Dam is an attempt to shift liability for future dam maintenance costs to the public.[46]

35.     American Whitewater also questions staff's determination of an adverse effect on historical resources based solely on the age of the project structures, not on actual eligibility for listing.  American Whitewater suggests in so doing, the Commission could rationalize the elimination of a dam removal alternative in almost all cases, since most dams have been in place for more than 50 years.[47]

36.     Last, FWS states that the Commission should analyze:  (1) would the water level drop under various dam removal or breach alternatives be problematic for water supply:  (2) can infrastructure concerns raised by the City be addressed or mitigated; and (3) under the dam removal alternative, what potential is there to mitigate impacts to historic features.[48]

37.     In its answer, the licensee argues that a surrender proceeding is not the appropriate forum for stakeholders to seek significant changes to existing infrastructure or construct new facilities because the public interest and comprehensive development evaluations required for licensing proceedings do not apply upon surrender.[49]  The licensee maintains that none of the comments provide a rationale for why the Commission should deviate from this long-standing precedent and policy.[50]  The licensee explains that the Stone Dam provides a necessary water supply for multiple local jurisdictions, providing a source of

---

[44] *Id.* at 4.

[45] *Id.* at 3.

[46] *Id.* at 3.

[47] *Id.* at 4.

[48] FWS February 5, 2021 Comments at 2.

[49] Aclara February 22, 2021 Answer at 4.

[50] *Id.* at 5.

water for local firefighting efforts, serving as the source of processing water for industrial operations, and supporting infrastructure within the river.[51]

38.    The licensee also notes that the two projects mentioned by American Whitewater in comments, i.e., the Dillsboro and Sullivan Creek Projects, are projects where the Commission required dam removal and recreation measures only because the licensees in those proceedings proposed them as part of the proposed action.  The licensee argues that those projects are therefore not representative of this surrender.[52]  The licensee recommends the Commission reject the comments from the resource agencies and American Whitewater and approve the surrender of the project.

39.    Commission staff have considered these comments, and below we expand on the effects of the dam removal alternative, constructing fish passage facilities, and elaborate on license conditions of the downstream projects with respect to fish passage.  The projects in order going downstream, again, are Somersworth Hydroelectric Project No. 3820, Lower Great Falls Hydroelectric Project No. 4451, Rollinsford Hydroelectric Project No. 3777, and the South Berwick Hydroelectric Project No. 11163.  Currently, the South Berwick Project is the only project with operational fish passage facilities.

40.    Beneficial effects of dam removal or adding fish passage facilities include those identified in comments on the EA, e.g., connectivity to upstream habitat benefitting both anadromous and resident fish and removing obstructions that limit boating opportunities in the project area, which is within the city limits of Somersworth.  Dam removal or construction of new facilities may also serve to further resource agency goals on reaching production target goals towards sustainable fishing.  These beneficial effects would be significant and permanent.  Negative effects of dam removal or the construction of fish passage facilities would include temporary effects on water quality during dam removal; temporary adverse effects on aquatic species due to displacement and indirect effects of aquatic species resulting from impacts to water quality; impacts to air quality during construction in the immediate project vicinity; and an increase in noise and construction traffic.  A permanent change in aesthetics, either beneficial or negative, would result from removal of the dam and project reservoir.  It is unknown what effect dam removal would have on the City of Somersworth's existing water supply infrastructure.  However, the City stated that the project reservoir is its source of water supply and that its water treatment plant, as well as two bridges upstream, would be negatively impacted by any changes in impoundment levels.  Other unknowns include the amount of sediment in the reservoir and how that sediment would be dealt with if the projects dams were removed.

---

[51] *Id.* (citing City Oct. 9, 2019 Motion to Intervene).

[52] *Id.* at 6.

41.    Both the Rollinsford and the Lower Great Falls Projects have been relicensed since issuance of the EA.  Ordering paragraph (F) of the license for the Rollinsford Project[53] requires conditions, under section 18 of the FPA, as prescribed by the Department of Interior.  In general, those conditions require provisions for upstream and downstream fish and eel passage following license issuance.  With regards to upstream passage, provisions at the Rollinsford Project include:  (1) providing for upstream passage for American shad and river herring by installing a "technical" fishway at the Rollinsford Dam and either a technical fishway or a nature-like fishway in the lower section of the bypassed reach by March 15 of the fourth passage season after license issuance; unless a request is filed with the Commission within two years of license issuance to:  (a) construct facilities at the South Berwick Project to trap and truck fish upstream from the South Berwick Project; and (b) implement an operation and maintenance plan that includes provisions for trapping and transporting fish upstream from the South Berwick Project to the impoundments of the Rollinsford Project, the Lower Great Falls Project No. 4451, and the Somersworth Project No. 3820 by the third year after license issuance.

42.    Similar conditions, under section 18 of the FPA, were prescribed by the Department of Interior for the Lower Great Falls Project and are required by ordering paragraph (F) of that license.[54]  Specifically, the prescription requires for:  providing upstream passage for American shad and river herring by installing either a "technical" fishway from the tailrace, a technical fishway at the dam, or a "nature-like" fishway at the dam by March 15 of the fourth calendar year after permanent upstream fishways for American shad and river herring become operational at the Rollinsford Hydroelectric Project No. 3777.

43.    While it is clear that the requirements of the licenses for the downstream projects require upstream and downstream fish and eel passage, it is unknown at this time whether the Town of Rollinsford, New Hampshire (licensee for the Rollinsford Project) will choose to construct a fishway at the Rollinsford Dam or to trap and truck fish from the lowermost South Berwick Project to the upstream impoundments (including Rollinsford, Lower Great Falls and the Somersworth reservoirs), as provided in its prescription.  We elaborate on our authority to require fish passage below.

## C.    Environmental Justice

44.    The Commission follows Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or

---

[53] *Town of Rollinsford, New Hampshire,* 179 FERC ¶ 61,203 (2022).  Appendix C.

[54] *Green Mountain Power Corporation and City of Somersworth, New Hampshire,* 182 FERC ¶ 61,024 (2023).

environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[55]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[56]  Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[57]

---

[55] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.

[56] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629. The term also includes, but may not be limited to, minority populations, low-income populations, or indigenous peoples.  *See* EPA, EJ 2020 Glossary (Aug. 18, 2022), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[57] EPA, *Learn About Environmental Justice*, (Sept. 6, 2022), https://www.epa.gov/environmentaljustice/learn-about-environmental-justice. Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

45.     Consistent with the Council on Environmental Quality (CEQ)[58] and EPA[59] guidance and recommendations, the Commission's methodology for assessing environmental justice impacts considers:  (1) whether environmental justice communities (e.g., minority or low-income populations)[60] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.  As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[61]  Specifically, a minority population is present where either:  (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in a block group affected is 10% higher than the aggregate minority population percentage in the county.

46.     CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau.  Using *Promising Practices'* low-income threshold criteria method, low-income

---

[58] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQEJGuidance.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.  There were opportunities for public involvement for environmental justice communities during the Commission's environmental review processes, though the record does not demonstrate that these opportunities were targeted at engaging environmental justice communities.  *See supra* P 15.

[59] *See generally* EPA's Federal Interagency Working Group for Environmental Justice and NEPA's Committee, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (Promising Practices), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[60] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994).  Minority populations are those groups that include: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic. CEQ's *Environmental Justice Guidance* at 25.

[61] *See Promising Practices* at 21-25.

populations are identified as block groups where the percent of low-income population in the identified block group is equal to or greater than that of the county.[62]

47.    Appendix A of this order provides current minority and income data for areas near the project, as well as data for the relevant states and counties.  We used a 1-mile radius around the project boundary and identified communities that meet the following criteria.[63]  For this analysis, minority populations at the block group level are defined where either (a) the minority population of the affected area exceeds 50 percent, or (b) the minority population of the affected area is meaningfully greater (10 percent greater) than the minority population percentage in the county or state.  Low-income populations are identified based on the annual statistical poverty thresholds from the U.S. Census Bureau.  If the percent of low-income populations in the identified block group is equal to or greater than that of the county, then an environmental justice community is present.

48.    As shown in Appendix A, staff identified five block groups that meet the above criteria for either minority population or low-income, or both.  As described in the EA, no major modifications to the existing dams, buildings, or structures are proposed.[64]  We have identified no adverse impacts on environmental justice communities associated with this proposed surrender, which involves no new construction and no ground disturbing activities.  Therefore, we find the project will not result in disproportionately high and adverse impacts on the identified environmental justice communities.

## VII.    Dam Safety

49.    Staff from the Commission's Division of Dam Safety and Inspections, New York Regional Engineer (D2SI-New York Regional Engineer) last inspected the project on May 19, 2022.  The project structures were found to be in satisfactory condition.  No conditions were observed that would threaten the integrity and safety of the project structures and there are no outstanding dam safety items at the project.   By letter dated August 2, 2022, the D2SI-New York Regional Engineer identified several items for future maintenance and monitoring.  The licensee adequately addressed these items by letter dated August 5, 2022.[65]

---

[62] *See Promising Practices* at 25.

[63] A 1-mile radius around the project boundary is sufficiently broad for an area of study considering the impacts associated with the proposed surrender.

[64] EA at 3.

[65] Filed on January 31, 2023.

50.     When a project is surrendered, the Commission's jurisdiction over the project ends and future operation of any remaining works becomes the responsibility of the state entity with regulatory authority.  In this case, it is the New Hampshire Department of Environmental Services-Dam Safety and Inspections Section (New Hampshire DES-Dam Safety).  On October 15, 2019, and August 3, 2022, D2SI-New York Regional Engineer staff contacted the New Hampshire DES-Dam Safety regarding surrender of the project. The New Hampshire DES-Dam Safety did not raise any concerns regarding surrender of the project.

51.     In comments on the application, several resource agencies questioned whether sand would be an appropriate fill material for the penstock and asked for clarification on using two sets of stoplogs (one at the existing cofferdam at the forebay and the other at the trashracks).  In its review of the surrender application, D2SI-New York Regional Engineer staff did not identify any concerns with the licensee's proposed decommissioning activities, including the use of sand or the proposed use of stoplogs. Therefore, we find the decommissioning measures proposed by the licensee to be acceptable.

52.     The New Hampshire DFG suggests the licensee should develop an operations/maintenance plan regarding post-surrender operation of the project and file it with the Commission, the State of New Hampshire, FWS, and the City.  Since the Commission's jurisdiction of the project ends upon surrender of the project, the appropriate operation post-surrender should be at the direction of the New Hampshire DES-Dam Safety.

53.     The Commission's D2SI-New York Regional Engineer staff concludes there is no reason to deny surrender of the license and recommends that the licensee decommission the project as proposed.  Staff recommend the licensee decommission the project as proposed, coordinate with the New Hampshire DES-Dam Safety and provide them copies of existing dam safety documents, and file with the D2SI-New York Regional Engineer a final decommissioning report once activities are complete.

## VIII.  **Discussion**

54.     Section 6 of the FPA allows licensees to voluntarily surrender existing licenses and cease operating project works, providing that licenses "may be . . . surrendered only upon mutual agreement between the licensee and the Commission after thirty days' public notice."[66]  The Commission, in acting on a surrender application, applies a broad

---

[66] 16 U.S.C. § 799.

"public interest" standard[67] and may require conditions not inconsistent with the FPA as it finds to be in the public interest.[68]

55.    The licensee has found continued operation of the project uneconomical and seeks Commission approval to surrender its license.  No ground disturbance is proposed, and decommissioning activities would be restricted to the forebay area, penstock, and powerhouse.  The licensee does not propose to remove the project dams.

56.    Based on our review, no environmental impacts are expected from surrender of the project as proposed, except for an adverse effect on potentially historic structures because they are leaving federal jurisdiction.  The project dams would continue to block passage for both anadromous and resident fish and eels and would continue to be obstructions to any canoeing or kayaking.  No modifications to these structures are proposed, and they would remain as they are now.  The D2SI-New York Regional Engineer staff have coordinated their review of the surrender with the New Hampshire DES-Dam Safety.  No issues were identified.

57.    Commenters argue that the surrender of the project license should be contingent on dam removal or the construction of fish passage facilities.  In this order, we have identified both beneficial and adverse effects related to dam removal and the construction of fish passage facilities at the project.  We have also identified the unknowns associated with dam removal.  The project impoundment created by Stone Dam serves as a source of water supply not only for Somersworth, New Hampshire, and Berwick, Maine, but for the licensee's manufacturing needs as well.  Additionally, the reservoir serves as a source of water for local firefighting efforts, and the City of Somersworth, New Hampshire, expressed concern that infrastructure within the reservoir (water treatment plants and bridges) may be impacted by changes to water surface elevations.  Regarding the FWS's recommendation to further quantify these impacts, we agree with the licensee that further evaluation is unnecessary for the purposes of this surrender.

58.    Weighing these existing uses of the reservoir, the location of the project dams, the anticipated effects of surrender of the license as proposed, as well as the anticipated effects of dam removal, we find that dam removal is not warranted as part of surrender of this license.  Therefore, although our Decommissioning Policy Statement affirms the

---

[67] *FPL Energy Me. Hydro, LLC*, 106 FERC ¶ 61,038, at P 20 (2004), *reh'g denied*, 107 FERC ¶ 61,120 (2004), *aff'd on other grounds*, *Save our Sebasticook v. FERC*, 431 F.3d 379 (D.C. Cir. 2005) (*FPL Energy*).  The broad public interest standard is not the same as the public interest/comprehensive development standards applied to licensing proceedings by FPA sections 4(e) and 10(a)(1).  *Id.* (citing *Niagara Mohawk Power Corp.*, 100 FERC ¶ 61,185, at PP 12-13 (2002)).

[68] 16 U.S.C. § 803(g).

Commission's statutory power, in rare instances, to require the removal of a project dam,[69] it would not be in the public interest to do so here.[70]

59.    With respect to providing fish passage as several commenters have recommended here, it is Commission policy to not require the installation of fish passage facilities as a condition of license surrender.[71]  Rather, any new facilities, would be for any 'successor' agency to consider.[72]

60.    This order makes the project surrender contingent upon the licensee providing documentation to the Commission's D2SI-New York Regional Engineer that it has decommissioned the project facilities as required by this order.  The surrender will not be effective until the D2SI-New York Regional Engineer issues a letter finding that the conditions of this order have been satisfied.  With these conditions, the surrender application should be approved.

---

[69] Decommissioning Policy Statement at 28; *see Edwards*, 81 FERC ¶ 61,255 at 62,201 (requiring dam removal after finding that "no condition can be fashioned under existing technology that will allow adequate fish passage past the project dam").  Unlike the project in *Edwards*, two municipalities rely on these project facilities for water supplies.

[70] *See e.g.*, *Pub. Util. Dist. No. 1 of Okanogan County*, 169 FERC ¶ 61,215, at P 18 (2019) (explaining that a licensee should not be required to remove or modify structures that it did not build pursuant to its license); *Great Bear Hydropower, Inc.*, 156 FERC ¶ 62,113, at P 4 (2016) (delegated order) (permitting surrender where the licensee removes hydroelectric facilities but leaves the state to perform any future dam removal); *VC Porterdale Hydroelectric, LLC*, 153 FERC ¶ 62,261 (2015) (delegated order) (refusing to require removal of the dam where the benefits of restoring the river to its original state were outweighed by the significant historic, social, and aesthetic benefits of the dam to the community at large); *Rochester Gas & Electric*, 99 FERC ¶ 61,012, at 61,040, *on reh'g*, 100 FERC ¶ 61,113, at 61,447 (2002) (refusing to require dam removal that could result in adverse impacts to water quality and downstream fishery resources); *Pub. Serv. Co. of N.H.*, 75 FERC ¶ 61,111, at 61,382 (1996) (refusing to require dam removal due to impacts on recreation, economics, and the environment)

[71] *Project Decommissioning at Relicensing; Policy Statement*, FERC Stats. & Regs. ¶ 31,011, at 28 (1994) (cross-referenced at 69 FERC ¶ 61,336) (Decommissioning Policy Statement)).

[72] Decommissioning Policy Statement at 31.

The Director orders:

(A)    Aclara Meters, LLC's (licensee) application to surrender the license for the Somersworth Hydroelectric Project No. 3820, filed on March 29, 2019, is approved, subject to the requirements of the ordering paragraphs below.

(B)    The licensee must complete the following decommissioning activities within 90 days from the date of this order:  (a) ensure the stoplogs are down at the forebay; (b) leave the cofferdam, just prior to the entrance to the trashrack and penstock, in its current location; (c) disconnect the power supply to the forebay at the power source located on Aclara Meters, LLC premises; (d) remove the trashrack and gear from the forebay area; (e) fill the forebay with sand backfill material; (f) fill the penstock with sand; (g) remove all hydraulic fluids from the powerhouse; (h) disconnect the generator and switch gear; (i) remove all electrical equipment (cabinets) from the powerhouse; (j) close all gates at the gatehouse; and (k) keep the 2-foot-wide and 2-foot-high fill gate, which is used to re-water the power canal, open to provide Aclara Meters LLC's processing water.

(C)    Within 60 days from the date of this order, the licensee must coordinate with the New Hampshire Department of Environmental Services (NHDES)-Dam Safety and Inspection and provide them with copies of all existing dam safety document for the project deemed necessary by NHDES.

(D)    Within 30 days of completing decommissioning activities, the licensee must file with the Commission by eFiling to the appropriate Regional Office, a final report with photographs, that documents the project facilities have been decommissioned in accordance with this order.  The final report should also provide the status of transmitting existing dam safety documents for the project to the NHDES.

(E)    The surrender of the license for the Somersworth Project shall not be effective until the Commission's Division of Dam Safety and Inspections Regional Engineer has issued a letter stating that the project facilities have been decommissioned in accordance with this surrender order.

(F)    This order constitutes final agency action.  Any party may file a request for rehearing of this order within 30 days from the date of its issuance, as provided in section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*, and the Commission's regulations at 18 C.F.R. § 385.713 (2022).  The filing of a request for rehearing does not operate as a stay of the effective date of this order, or of any other date specified in this order.  The licensee's failure to file a request for rehearing shall constitute acceptance of this order.

*for* CarLisa Linton
Director
Division of Hydropower Administration
    and Compliance

## Appendix A

| Minority Populations by Raceᵃ and Ethnicity and Low-Income Populations in the Project Area | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **RACE AND ETHNICITY COLUMNS** | | | | | | | | | **LOW-INCOME COLUMN** |
| **State/County/ Tract/Block Group** | **White (Not Hispanic) (%)** | **Black or African American (%)** | **Asian (%)** | **American Indian and Alaskan Native (%)** | **Native Hawaiian and Other Pacific Islander (%)** | **Some other race (%)** | **Two or more races (%)** | **Hispanic or Latino (%)** | **Total Minority (%)** | **Total Persons Below Poverty Level (%)** |
| **New Hampshire** | 90.1 | 1.4 | 2.7 | 0.1 | 0.0 | 0.1 | 1.8 | 3.7 | 9.9 | 7.9 |
| **Strafford County, NH** | 90.6 | 0.9 | 3.3 | 0.1 | 0.0 | 0.0 | 2.5 | 2.5 | 9.4 | 9.9 |
| **Census Tract 830.01, Block Group 1** | 92.2 | 2.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5.5 | 7.8 | 0.0 |
| **Census Tract 830.01, Block Group 2** | 70.5 | 3.6 | 18.7 | 0.0 | 0.0 | 0.0 | 6.2 | 1.0 | 29.5 | 0.0 |
| **Census Tract 830.01, Block Group 3** | 96.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 3.7 | 3.7 | 4.9 |
| **Census Tract 830.01, Block Group 4** | 80.4 | 0.0 | 0.0 | 1.7 | 0.0 | 0.0 | 12.2 | 5.7 | 19.6 | 16.2 |
| **Census Tract 830.01, Block Group 5** | 78.3 | 9.2 | 9.5 | 0.0 | 0.0 | 0.0 | 0.0 | 3.0 | 21.7 | 36.5 |
| **Census Tract 830.01, Bock Group 6** | 92.9 | 0.0 | 2.5 | 0.0 | 0.0 | 0.0 | 4.6 | 0.0 | 7.1 | 6.8 |
| **Census Tract 830.2. Block Group 4** | 92.8 | 3.1 | 0.0 | 0.0 | 0.0 | 4.1 | 0.0 | 0.0 | 7.2 | 0.0 |
| **Census Tract 830.2 Block Group 5** | 99.5 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 | 15.4 |
| **Maine** | 93.2 | 1.3 | 1.1 | 0.6 | 0.0 | 0.1 | 2.0 | 1.7 | 6.8 | 12.2 |
| **York County, ME** | 94.2 | 0.8 | 1.2 | 0.4 | 0.0 | 0.0 | 1.5 | 1.7 | 5.8 | 7.8 |
| **Census Tract 320, Block Group 1** | 91.2 | 0.0 | 0.5 | 0.0 | 0.9 | 0.0 | 3.4 | 4.0 | 8.8 | 0.0 |
| **Census Tract 320, Block Group 2** | 99.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 | 0.5 | 6.6 |
| **Census Tract 320, Block Group 3** | 95.0 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 4.7 | 0.0 | 5.0 | 4.0 |

Source: U.S. Census Bureau. 2019 a b. American Community Survey, 2015-2019, File # B01017 and File #B03002
ᵃ "Minority" refers to people who reported their ethnicity and race as something other than non-Hispanic White.
Gray shading indicates an environmental justice community for either low-income, or minority populations exceeding the established thresholds.
Due to rounding differences in the dataset, the totals may not reflect the sum of the addends.

**Attachment B: Rehearing Denial**

184 FERC ¶ 62,047
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Aclara Meters, LLC                                      Project No.  3820-015

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(July 21, 2023)

     Rehearing has been timely requested of the Commission's delegated order issued on May 22, 2023, in this proceeding by the Director, Division of Hydropower Administration and Compliance, Office of Energy Projects.  *Aclara Meters*, *LLC*, 183 FERC ¶ 62,095 (2023).  In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied.  16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

     As provided in 16 U.S.C. § 825*l*(a), the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section.  As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Deputy Secretary.

**Attachment C: Rehearing Order**

184 FERC ¶ 61,183
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

Aclara Meters, LLC                                                      Project No.  3820-015

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued September 21, 2023)

1.      On May 22, 2023, Commission staff issued an order approving surrender of
Aclara Meters, LLC's (Aclara) license for the Somersworth Hydroelectric Project
No. 3820 (Somersworth Project), located on the Salmon Falls River in Strafford County,
New Hampshire, and York County, Maine (Surrender Order).[1]  On June 20, 2023,
American Whitewater filed a timely request for rehearing of Commission staff's order.

2.      Pursuant to *Allegheny Defense Project v. FERC*,[2] the rehearing request filed in this
proceeding may be deemed denied by operation of law.  However, as permitted by
section 313(a) of the Federal Power Act (FPA),[3] we are modifying the discussion in the
Surrender Order and continue to reach the same result in this proceeding, as discussed
below.[4]

---

[1] *Aclara Meters, LLC*, 183 FERC ¶ 62,095 (2023) (Surrender Order) (delegated
order).

[2] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[3] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a
court of appeals, as provided in subsection (b), the Commission may at any time, upon
reasonable notice and in such manner as it shall deem proper, modify or set aside, in
whole or in part, any finding or order made or issued by it under the provisions of this
chapter.").

[4] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the
outcome of the order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*,
809 F.3d 55, 56-57 (D.C. Cir. 2015).

## I.    Background

3.    On September 29, 1981, General Electric Company was issued a license for the 2.2-megawatt (MW) Somersworth Project.[5]  The project includes:  (1) a 400-foot-long, 16.5-foot-high stone gravity structure (Stone Dam); (2) a gatehouse with four intake gates and a fill gate leading to the power canal; (3) a 1,600-foot-long, 15-foot deep, and 20-foot wide power canal, constructed of granite block and stone; (4) a 600-foot long, 10-foot-diameter penstock; (5) a trashrack at the bypass gate;[6] (6) a powerhouse containing two turbines with a hydraulic capacity of 40-460 cubic feet per second (cfs); (7) a 107-foot-long, 19-foot-high dam (Back Dam), located at the terminus of the bypassed reach and adjacent to the powerhouse; and (8) appurtenant works.[7]  The project operates in a run-of-river mode, as required by Article 401 of the license,[8] and releases a minimum of 10 cfs from Stone Dam into the bypassed reach, as required by Article 26.  The project is classified as having a significant hazard potential.

4.    Back and Stone Dams are the fourth and fifth dams on the Salmon Falls River, respectively.  Downstream of the Somersworth Project are three other Commission-licensed projects (looking downstream):  the Lower Great Falls Hydroelectric Project No. 4451, the Rollinsford Hydroelectric Project No. 3777, and the South Berwick Hydroelectric Project No. 11163.  Approximately nine miles upstream is the Boston Felt Project No. 4542, which is licensed as an exempted project.

5.    Due to a penstock failure, the Somersworth Project has not generated power since June 2011.  Aclara determined that relicensing the project would be uneconomic, and therefore, on March 29, 2019, filed an application to surrender the project.[9]  In its

---

[5] *Gen. Elec. Co.*, 16 FERC ¶ 62,598 (1981) (order issuing minor license); *Gen. Elec. Co.*, 40 FERC ¶ 62,196 (1987) (order amending license to increase the total licensed capacity from 1.5 MW to 2.2 MW by installing one additional turbine-generator); *Gen. Elec. Co.*, 154 FERC ¶ 62,199 (2016) (order approving transfer of license to Aclara).

[6] The trashrack prevents debris from accumulating at the entrance or base of the spillway and becoming a hazard for migrating aquatic species.

[7] Surrender Application at 2-3; *Gen. Elec. Co.,* 40 FERC ¶ 62,196; *Gen. Elec. Co.,* 16 FERC ¶ 62,598.

[8] *Gen. Elec. Co.*, 40 FERC at 63,315.

[9] The license for the Somersworth Project expired on August 31, 2021, and since then, the project has been authorized to continue operation pursuant to section 16.18 of the Commission's regulations, pending the Commission's review of the surrender

surrender application, Aclara stated that it would continue passing all inflow over the Stone Dam's spillway crest or through the bypass gate, which is set at an opening that maintains the required 10 cfs minimum flow in the bypassed reach,[10] except for approximately 0.05 cfs released into the power canal for Aclara's manufacturing operations.  The licensee also noted that it would maintain vegetation control along the canal.  Aclara did not propose any major modifications to project dams, buildings, or structures, or any ground disturbing activities, including dam removal.  Further, the licensee indicated that it would engage with the City of Somersworth, New Hampshire (City), and the Town of Berwick, Maine, to pursue the sale of Stone Dam.

6.      On September 11, 2019, Commission staff issued public notice of the application, establishing a deadline of October 11, 2019, for filing protests, comments, and motions to intervene.  American Whitewater and the City filed timely motions to intervene and comments.  The U.S. Fish and Wildlife Service (FWS), New Hampshire Fish & Game Department (New Hampshire FGD), New Hampshire Department of Environmental Services (New Hampshire DES), and Sebago Chapter of Trout Unlimited (Sebago TU) filed comments.  Aclara filed comments in response to the comments and interventions. These comments were addressed in the environmental assessment (EA) and Surrender Order.

7.      To satisfy the requirements of the National Environmental Policy Act (NEPA), Commission staff issued an EA on January 6, 2021, which analyzed the environmental effects of the proposed surrender.  The EA found that the proposed surrender would have no effects on geology and soils, water quantity, water quality, terrestrial resources (including wildlife and botanical resources), and recreation.[11]  The EA also found that the proposed surrender would have no effect on fisheries,[12] but noted that if fish passage facilities are installed at the two Commission-licensed projects immediately downstream of the Somersworth Project, the project dams would continue to block passage of diadromous species.[13]

---

application.  *See* Notice of Authorization for Continued Operation (Sept. 14, 2021).

[10] The invert of this gate is below the crest of Stone Dam.  Except for the licensee's 0.05 cfs processing water released into the canal, most inflow would pass over the Stone Dam's spillway upon surrender so flows released into the bypassed reach would be much higher than 10 cfs and would approximate inflow.

[11] EA at 9.

[12] *Id.* at 8, 16.

[13] *Id.* at 16.

8.     The Maine Department of Environmental Protection, Maine Department of Inland
Fisheries and Wildlife, New Hampshire FGD, FWS, Sebago TU, Great Bay Chapter of
Trout Unlimited, and American Whitewater filed comments on the EA. The licensee filed
a response to the comments.  The comments were addressed in the Surrender Order.

9.     In the Surrender Order, Commission staff approved Aclara's proposed
decommissioning activities, which includes:  (1) leaving the cofferdam in place at the
forebay, just prior to the entrance to the trashrack and penstock; (2) removing the
trashrack and gear leading to the penstock and installing stoplogs; (3) disconnecting the
power supply to the forebay at the power source located on Aclara's premises; (4) filling
the forebay with sand and backfill material; (5) filling the penstock with sand;
(6) removing all hydraulic fluids from the powerhouse; (7) disconnecting the generator
and switch gear; (8) removing all electrical equipment (i.e., cabinets) from the
powerhouse; and (9) closing all gates at the gatehouse, except for the 2 foot by 2 foot fill
gate which is used to re-water the power canal and would provide Aclara's processing
water for its manufacturing operations (approximately 25,000-30,000 gallons per day or
0.05 cfs).[14]

## II.    Discussion

10.    On rehearing, American Whitewater argues the Surrender Order erred by:
(1) failing to determine that dam removal is in the public interest and rejecting dam
removal as an alternative in the NEPA analysis; and (2) failing to comply with
section 401(a)(1) of the Clean Water Act.

### A.     Surrender without Dam Removal is in the Public Interest

11.    Section 6 of the FPA provides that a license "may be . . . surrendered only upon
mutual agreement between the licensee and the Commission after thirty days' public
notice."[15]  Because the FPA does not contain any further statutory standard, the
Commission, in acting on a surrender application, applies a broad "public interest"
standard.[16]

---

[14] Surrender Order, 183 FERC ¶ 62,095 at ordering para. (B).

[15] 16 U.S.C. § 799.

[16] *FPL Energy Me. Hydro, LLC*, 106 FERC ¶ 61,038, at P 20 (2004), *reh'g denied*, 107 FERC ¶ 61,120 (2004), *aff'd on other grounds*, *Save our Sebasticook v. FERC*, 431 F.3d 379 (D.C. Cir. 2005) (*FPL Energy*).  The broad public interest standard is not the same as the public interest/comprehensive development standards applied to licensing proceedings by FPA sections 4(e) and 10(a)(1).  *Id*.; *Niagara Mohawk Power Corp.*, 100 FERC ¶ 61,185, at PP 12-13 (2002) (explaining that the broad public interest

12.    The Commission's Decommissioning Policy Statement aligns with the broad public interest standard, requiring the Commission to consider the "various public interests" that are implicated by decommissioning.[17]  It states that the Commission should take appropriate steps to protect the public interest, which could include actions ranging from "simply shutting down the power operations to tearing out all parts of the project, including the dam, and restoring the site to its pre-project condition."[18]  As the policy makes clear, solutions necessarily will vary from case to case.[19]

13.    On rehearing, American Whitewater asserts that the Commission's order failed to provide adequate support for approving surrender of the project without requiring dam removal as a condition of surrender in violation of NEPA, the Administrative Procedure Act (APA), and FPA.[20]  It states that the Stone and Back Dams impede the natural flow of the river, obstruct flows capable of supporting aquatic habitat, completely block the river preventing fish passage, eliminate the possibility of recreational activities on the river, and pose an exceptional hazard to life, such that leaving the dams in place is not in the public interest.[21]

---

standard is very different from the public interest/comprehensive development standard because a license application and surrender application are very different proposals).  In making its decision, the Commission will determine if the approved action is in the public interest.  *See Ariz. Pub. Serv. Co.*, 109 FERC ¶ 61,036, at PP 34, 39 (2004) (describing the public interest standard and finding the requested license surrender to be in the public interest).

[17] *Project Decommissioning at Relicensing; Pol'y Statement*, FERC Stats. & Regs. ¶ 31,011, at 31,231 (1994) (cross-referenced at 69 FERC ¶ 61,336) (Decommissioning Policy Statement).

[18] *Id.* at n.1.  In this case, the dams were constructed before the project was licensed.  Therefore, the baseline, pre-project condition considered in the Commission's public interest analysis includes the dams.

[19] *See Rochester Gas & Elec. Corp.*, 100 FERC ¶ 61,113, at P 12 (2002).

[20] *See* Rehearing Request at 3, 12-13.  Specifically, American Whitewater asserts that the Surrender Order is unsupported by substantial evidence and is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA and FPA.  *See id.* at 12.  American Whitewater adds that the Surrender Order fails to take a "hard look," as required by NEPA, at dam removal as an alternative to surrender.  *Id*. at 13.

[21] *See id.* at 9-10.

14.      American Whitewater also avers that the Commission ignored evidence in the record of the benefits of dam removal[22] and expresses concern that the Commission declined to further evaluate the impacts dam removal would have on the City's water supply and how those impacts might be mitigated.[23]  American Whitewater asserts that the Commission merely offered conclusory statements, without providing rationale in dismissing the dam removal alternative in the EA and Surrender Order, and the Commission should have completed a full analysis on the impacts of dam removal, including consideration of how dam removal would impact the City's water supply, fire suppression capabilities, and water treatment.[24]

### 1.      **Fish Passage and Recreation**

15.      American Whitewater argues that the Surrender Order should have required dam removal to allow fish passage, noting that the licensees for two downstream projects, the Lower Great Falls and Rollinsford Hydroelectric Projects, recently entered into a settlement agreement with FWS to provide fish passage at those projects.[25]  American Whitewater states that the settlement agreement's requirements were incorporated into the licenses for the projects, both of which were issued after the EA was completed in this proceeding.[26]  American Whitewater asserts that, as a result of the settlement agreement, anadromous fish runs in the Salmon Falls River will reach the Somersworth Project in the reasonably foreseeable future[27] and that removal of the Stone and Back Dams would provide approximately nine additional miles of accessible habitat for fish

---

[22] *See id.* at 6, 13-14 (noting that throughout the proceeding American Whitewater, along with various resource agencies and other commenters, requested the Commission and licensee evaluate a dam removal alternative to the proposed surrender).

[23] *Id.*

[24] *See id.* at 15-17 (expressing concern that the Commission inappropriately rejected FWS's request that the Commission further quantify the effects of dam removal on the City's use of the reservoir, and stating that the Commission failed "to articulate with reasonable clarity the basis for its rejection of the dam removal alternative including a weighing of the relative importance of various considerations and exploring reasonable mitigation for detrimental effects").

[25] *Id.* at 8.  American Whitewater notes that the settlement agreement requires fish passage either through construction of a permanent volitional fishway or through a trap-and-truck operation.  *Id.*

[26] *Id.* at 9.

[27] *Id.*

species.[28]  American Whitewater further notes that FWS requested that the Commission consider dam removal as an alternative to the proposed surrender and requested that the Commission analyze the ecological and socioeconomic effects of restoring fish runs.[29]

16.     In the EA, Commission staff recognized that if fish passage facilities were to be installed at the Lower Great Falls and Rollinsford Projects, the Stone and Back Dams would block upstream and downstream passage of diadromous species.[30]  In the Surrender Order, Commission staff acknowledged that the licenses for the downstream projects require fish and eel passage, but stated that it is unknown whether the licensee for the Rollinsford Project will choose to construct a permanent fishway or employ a trap-and-truck operation, which may result in fish being released at locations above the Stone and Back Dams, so that those structures would not impede passage.[31]  The Surrender Order also discussed several benefits of dam removal or installing fish passage for fish species,[32] and identified negative effects of dam removal or the construction of fish passage, including temporary effects on water quality, displacement of resident aquatic species, and temporary impacts to air quality.[33]

17.     Regarding recreation, American Whitewater refers to two Commission-licensed projects, the Dillsboro Hydroelectric Project No. 2602 and the Sullivan Creek Project No. 2225, where the Commission found dam removal to be in the public interest, noting several benefits including significant improvement to recreational opportunities.[34]  American Whitewater asserts that the presence of the Stone and Back Dams creates an unsuitable environment for recreational activities, and that, but for the existence of the Stone and Back Dams, recreational activities would occur in the area.[35]  Therefore, American Whitewater contends that, as in the Dillsboro and Sullivan Creek proceedings,

---

[28] *Id.*

[29] *Id.* (citing FWS February 5, 2021 comments).

[30] EA at 16.

[31] Surrender Order, 183 FERC ¶ 62,095 at P 43.

[32] *See id.* P 40.

[33] *Id.*

[34] Rehearing Request at 5.

[35] *See id.* at 9-11.

the Surrender Order should have found dam removal to be in the public interest and required it as a condition of the surrender.[36]

18.     The Surrender Order acknowledged that dam removal would increase river connectivity and therefore could have beneficial impacts on recreation.[37]  However, the order also identified that dam removal would permanently change aesthetics by removing the reservoir which is currently used for boating activities.[38]  In the EA, Commission staff found the impacts on recreation of not removing the dams would be negligible due to the industrial setting of the project.[39]  Although American Whitewater contends that but for the existence of the Stone and Back Dams, recreation would occur in the area, it is unknown if, after surrender of the project, the area would be publicly accessible to accommodate recreation in the area.

19.     Further, the Commission's Decommissioning Policy Statement explains that at surrender, the Commission's jurisdiction ends, and the future operation of any remaining project works, including fish passage facilities and access to recreation, is the responsibility of the succeeding regulatory authority.[40]  Therefore, in the future, if fish and eel populations reach the Somersworth Project dams, the successor regulatory authority may choose to require the installation of fish passage facilities or to remove the dams to improve river connectivity and fish passage.[41]  Similarly, any ongoing recreational opportunities would occur or continue as a result of the licensee's voluntary

---

[36] *See id.* at 5, 11.

[37] *See* Surrender Order, 183 FERC ¶ 62,095 at P 40.

[38] *See id.  See also* EA at 15.

[39] EA at 15 ("Upon surrender, Stone Dam would remain, and boating would continue in the project's reservoir as it has in the past.  Both dams would continue to be barriers to boaters using the area because they lack portage.  Given the industrial setting of the project, particularly between the two dams, we conclude this would be a negligible impact.").

[40] Decommissioning Policy Statement, FERC Stats. & Regs. ¶ 31,011 at 31,233..

[41] *See e.g., Great Bear Hydropower, Inc.*, 156 FERC ¶ 62,113, at P 15 (2016) (considering the benefits of dam removal but declining to require it at surrender, noting that the state of may choose to remove the dam in the future).

actions or the requirements of the new regulatory authority following surrender.[42]  In consequence, neither fish passage nor recreation counsels dam removal.

## 2.    Dam Safety

20.    American Whitewater asserts that the Back Dam is obsolete, serves no purpose, and poses significant drowning risks to swimmers.[43]  It contends that low-head dam structures are "inherently dangerous" and pose significant safety risks to boaters, tubers, and swimmers because circulating flows can prevent escape.[44]

21.    The Surrender Order addressed the safety of the dam, noting that staff from the Commission's Division of Dam Safety and Inspections, New York Regional Engineer (D2SI-New York Regional Engineer) last inspected the project on May 19, 2022, and found the project structures to be in satisfactory condition.[45]  Through the D2SI-New York Regional Engineer's inspection, no conditions were observed that would threaten the integrity and safety of the project structures and no outstanding dam safety items were identified at the project.[46]  In addition, staff checked the Commission's records to determine if there is a history of public safety incidents at either Stone or Back Dams, for example, boats going over the spillways, drownings, or other incidents associated with low-head structures as mentioned by American Whitewater.[47]  No such public safety incidents have been reported.  Further, the Surrender Order requires the licensee to coordinate with the New Hampshire DES-Dam Safety and Inspection to provide copies of all existing dam safety documents so that the state can continue to evaluate the safety of the dams.[48]  Accordingly, there are no safety issues that suggest that the dams should be removed.

---

[42] *Id.*

[43] *Id.* at 6, 10.

[44] *Id.* at 10.

[45] Surrender Order, 183 FERC ¶ 62,095 at P 49.

[46] *Id.*

[47] Licensees must report public safety incidents in accordance with 18 C.F.R. § 12.10(b) (2022).

[48] Surrender Order, 183 FERC ¶ 62,095 at ordering para. (C).

### 3.     Assessment of Historic Properties

22.     Next, American Whitewater expresses concern with the Commission staff's assessment of the project surrender on historical properties, questioning staff's determination that dam removal would have an adverse effect on historical resources based solely on the age of the project structures, not on actual eligibility for listing on the National Register of Historic Places (National Register).[49]  American Whitewater states that since most dams have been in place for more than 50 years, Commission staff's conclusion regarding the historic nature of the facilities is inappropriate.[50]

23.     In the Surrender Order, Commission staff noted that the eligibility for listing the project features[51] on the National Register has not been determined.[52]  The Surrender Order notes that construction of the Stone Dam was completed in 1929 and it is unknown when the Back Dam was constructed.[53]  Generation of power was not added to the facilities until the 1980s.[54]  Commission staff appropriately determined that based on the age of the structures, the facilities may be eligible for listing, concluding that surrender of the license may have an adverse effect on potentially historic project features. Commission staff properly took into consideration the historic nature of the project features in considering the surrender as proposed and the dam removal alternative, and the conclusions on the potential historic significance of the project features was reasonable.

### 4.     Rejection of Dam Removal Alternative and Public Interest Finding

24.     The Surrender Order appropriately concluded, after considering the anticipated effects, that approving the proposed surrender, without requiring dam removal, was in the public interest.[55]  Although American Whitewater correctly notes that the Commission

---

[49] Rehearing Request at 18.

[50] *Id.*

[51] In this case, the entire project within the project boundary is considered the Area of Potential Effect (APE).

[52] Surrender Order, 183 FERC ¶ 62,095 at P 25.

[53] *Id.*

[54] *Id.*

[55] *See id.* P 58.

has the authority to require dam removal if it would be in the public interest,[56] regardless of whether the licensee agrees to remove the dam,[57] the Commission, in weighing the various public interests, has rarely required dam removal in situations where the applicant has not proposed such an action.[58] Thus, the cases cited by American Whitewater are inapposite because the licensees for the Dillsboro and Sullivan Creek Projects proposed dam removal in their surrender applications.[59]

25.    While dam removal would result in some benefits, temporary negative impacts would also ensue, as described in the EA, the Surrender Order, and above, which the Commission must take into account when making its public interest finding. Additionally, leaving the dams in place allows for the possibility of future power generation at the project site, which would be in the public interest.[60]

---

[56] Rehearing Request at 4; Decommissioning Policy Statement, FERC Stats. & Regs. ¶ 31,011 at 31,233.

[57] Rehearing Request at 5.

[58] *See e.g., Great Bear Hydropower, Inc.*, 156 FERC ¶ 62,113 at P 4 (permitting surrender where the licensee removes hydroelectric facilities but leaves the state to perform any future dam removal); *VC Porterdale Hydroelectric, LLC*, 153 FERC ¶ 62,261 (2015) (refusing to require removal of the dam where the benefits of restoring the river to its original state were outweighed by the significant historic, social, and aesthetic benefits of the dam to the community at large); *Rochester Gas & Elec Corp.*, 99 FERC at 61,040, *reh'g denied*, 100 FERC ¶ 61,113 at P 12  (refusing to require dam removal that could result in adverse impacts to water quality and downstream fishery resources); *Pub. Serv. Co. of N.H.*, 75 FERC ¶ 61,111, at 61,382 (1996) (declining to require dam removal due to impacts on recreation, economics, and the environment).

[59] *See Duke Energy Carolinas, LLC*, 120 FERC ¶ 61,054 at P 8 (2007); *Pub. Util. Dist. No. 1 of Pend Oreille Cty., Wash.*, 142 FERC ¶ 62,232, at P 22, 25 (2013).

[60] *See e.g.*, *John M. Skorupski*, 79 FERC ¶ 61,339, at P 17 (2007) (waiving provisions of the Commission's regulations to avoid surrender where a party was potentially interested in continuing licensed operation of the project) (citing *Wis. Elec. Power Co.*, 73 FERC ¶ 61,208, at 61,574 (1995)).  *See also* Decommissioning Policy Statement, FERC Stats. & Regs. ¶ 31,011 at 31,228-29 (noting that in considering decommissioning at relicensing, the Commission should consider the loss of power and alternative power sources in weighing nondevelopmental considerations of its decision).

26.    Notably, in its comments, the City has stated that it relies on the reservoir for its water supply, water treatment, and fire suppression,[61] which the Commission must take into consideration in the public interest finding.[62]  Additionally, the City expressed concern that a change in the water surface elevation of the reservoir caused by dam removal would also negatively impact local infrastructure such as bridges and local water treatment plants.[63]  Maintaining the existing reservoir to provide essential services, including water supply, fire suppression capabilities, and water treatment, to the surrounding community is in the public interest.

27.    American Whitewater also contends that the EA, which the Surrender Order relied on, inappropriately concluded that the surrender proposal would have no effects on geology and soils, water quality, water quantity, terrestrial resources, fisheries, or recreation; arguing that as compared to a dam removal alternative, the proposed surrender would result in negative impacts.[64]  American Whitewater disputes this conclusion, and states that comments in the record demonstrate that dam removal would be more beneficial than leaving the dam in place.[65]  Thus, American Whitewater avers that the EA's and Surrender Order's conclusion to reject the dam removal alternative is not supported by substantial evidence.[66]  However, as stated above, the dams were constructed before the project was licensed, and, therefore, the baseline, pre-project condition considered in the environmental analysis includes existence of the dams. Leaving the dams in place would not result in any new environmental impacts to the baseline condition, as concluded in the EA and Surrender Order.[67]

28.    American Whitewater also asserts that the Surrender Order is arbitrary and capricious because it fails to take the NEPA required "hard look" at dam removal as an alternative to the licensee's surrender plan.[68]  As an initial matter, we find that the

---

[61] City Oct. 9 2019 Comments and Intervention at 1.

[62] The Commission considers the input of states and municipalities on surrender. Decommissioning Policy Statement, FERC Stats. & Regs. ¶ 31,011 at 31,232.

[63] City Oct. 9 2019 Comments and Intervention at 1.

[64] Rehearing Request at 15.

[65] *Id.*

[66] *Id.*

[67] EA at 9, 16; Surrender Order, 183 FERC ¶ 62,095 at P 29.

[68] Rehearing Request at 13.

removal of the dams is not a reasonable alternative under NEPA because the reservoir
provides a water supply resource to the City, making dam removal impractical.  The
Commission has previously recognized that "[a]n agency may eliminate those
alternatives that will not achieve a project's goals or which cannot be carried out because
they are too speculative, infeasible, or impractical" and that "[u]nsupported, hypothetical
alternatives are not reasonable alternatives that warrant further NEPA consideration."[69]

29.     Nevertheless, the Surrender Order evaluated the potential effects of dam removal[70]
and appropriately concluded that the proposed surrender is in the public interest.[71]  The
fact that American Whitewater disputes this determination does not, in and of itself,
undermine its suitability.[72]  The Surrender Order balanced the benefits and negative
impacts of approving the surrender as proposed with the benefits and negative impacts of
removing the dam, concluding that the concrete benefits provided by the dam far

---

[69] *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197, at PP 138-139 (2018).  *See
Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1323 (10th Cir. 2004) (The Commission need
not analyze "the environmental consequences of alternatives it has in good faith rejected
as too remote, speculative, or ... impractical or ineffective.") (quoting *All Indian Pueblo
Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992) (internal quotation marks
omitted)); *NRDC. v. Morton*, 458 F.2d 827, 837-38 (D.C. Cir. 1972) (same).  *See also
Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1485 (D.C. Cir. 1990) (NEPA does not
require detailed discussion of the environmental effects of remote and speculative
alternatives).

[70] Surrender Order, 183 FERC ¶ 62,095 at PP 39-40.

[71] *See id*. at PP 57-58.

[72] It is well-settled that NEPA does not mandate particular results or selection of
the least environmentally damaging alternative so long as each alternative is adequately
discussed and a brief explanation is provided for why an alternative is rejected.  *See
Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (*Methow Valley*)
("[I]t is now well settled that NEPA itself does not mandate particular results, but simply
prescribes the necessary process.  If the adverse environmental effects of the proposed
action are adequately identified and evaluated, the agency is not constrained by NEPA
from deciding that other values outweigh the environmental costs.") (internal citations
omitted); *see also* 40 C.F.R. § 1502.14(a) (2022) ("Evaluate reasonable alternatives to the
proposed action, and, for alternatives that the agency eliminated from detailed study,
briefly discuss the reasons for their elimination.").  *See Minisink Residents for Envtl.
Pres. & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) ("Though we can see how
Petitioners may disagree with [the Commission's] takeaway, their disagreement does not
mean that FERC failed to consider the issue altogether, as they suggest.").

outweigh the speculative benefits to recreation and fish passage postulated by American Whitewater.  Indeed, the Decommissioning Policy Statement makes clear that where a project has multiple uses, such as serving key municipal water needs, the Commission will consider those functions.[73]  Therefore, considering all the information on the record, Commission staff appropriately concluded that approving the surrender proposal without requiring dam removal was in the public interest.

## B.    Clean Water Act

30.    Section 401(a)(1) of the Clean Water Act requires that any applicant proposing to conduct "any activity … which may result in any discharge into the navigable waters" obtain a water quality certification from the state or an authorized Tribe in which the discharge originates to ensure compliance with appropriate requirements.[74]  No license or permit may be granted until the applicant has obtained certification or certification has been waived.[75]

31.    American Whitewater argues that the Supreme Court has settled the definition of "discharge," broadly defining it through its common and ordinary meaning.[76]  Additionally, American Whitewater highlights Article 26 of the 1981 license for the Somersworth Project, which required the licensee to "discharge" a minimum flow of 10 cfs from stone dam and a minimum flow of 110 cfs immediately downstream of the powerhouse.[77]  American Whitewater contends that the proposed surrender, which included the licensee's plan to maintain the minimum flow requirements as required by the license and maintain 0.05 cfs into the power canal, constitutes a discharge under the Clean Water Act.[78]  Therefore, American Whitewater asserts that the Commission should not have issued the Surrender Order prior to the licensee obtaining a section 401 water

---

[73] The Commission's Decommissioning Policy Statement explains that "[i]t is unlikely that a dam or reservoir serving key municipal water needs, for example, is going to be shut down."  Decommissioning Policy Statement at 31,232.

[74] 33 U.S.C. § 1341(a)(1).

[75] *See id.*

[76] Rehearing Request at 19 (citing *S.D. Warren v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370 (2006)).

[77] Rehearing Request at 19.

[78] *Id.* at 20.

quality certification.[79]  Further, American Whitewater asserts that the EA and Surrender Order do not address whether the bypass reach flow or Aclara's withdrawal of processing water would be considered a discharge under the Clean Water Act, and fails to discuss whether Aclara's diverted processing water will be released back into the Salmon Falls River.[80]

32.    Section 401 applies where a surrender may result in a discharge.[81]  The Commission has typically only found this to be the case when a licensee is removing a dam or performing other construction activities, in which the Commission retains jurisdiction over those decommissioning activities.[82]  However, where a license surrender is subject to conditions that cannot result in a new discharge, no certification is required.[83]

33.    Here, the Commission is not authorizing a new discharge.  The licensee has stated that it will maintain minimum flows as was required by the license.  Additionally, the proposed surrender required Aclara to close all gates at the gatehouse, except a small 2'x2' fill gate to maintain 0.05 cfs into the power canal so that the power canal will remain watered and will provide processing water for Aclara's manufacturing needs. There will be no construction in connection with the surrender.  In approving this surrender, the Commission is not authorizing Aclara to undertake or continue operations of the project or any project works.  Therefore, the surrender, as approved, does not authorize a new discharge under the definition of the Clean Water Act.

34.    American Whitewater attempts to distinguish a case where the Commission found there would be no new discharge, *Rochester Gas and Electric Corp.*, with the current project.[84]  In that order, the Commission determined that an approved surrender did not constitute a new discharge, therefore, water quality certification was not required.[85]  The

---

[79] *Id.*

[80] *Id.* at 21.

[81] *See Portland Gen. Elec. Co.*, 107 FERC ¶ 61,158 (2004); *PacifiCorp*, 108 FERC ¶ 61,130 (2004); *Ariz. Pub. Serv. Co.*, 109 FERC ¶ 61,036 at PP 18-19.

[82] *See, e.g.*, *Pac. Gas & Elec. Co.*, 170 FERC ¶ 61,232, at P 4 n. 5 (2020).

[83] *Rochester Gas & Elec. Corp.*, 99 FERC ¶ 61,012, at 61,040, *reh'g denied*, 100 FERC ¶ 61,113, at P 12.

[84] Rehearing Request at 21-22.

[85] *See Rochester Gas & Elec. Corp.*, 100 FERC ¶ 61,113 at PP 16-17.

licensee in *Rochester Gas and Electric Corp.* proposed to take actions similar to Aclara's proposed actions, including sealing doors and gates and installing concrete bulkheads to prevent the passage of water to the turbines.[86]  American Whitewater contends that because Aclara has proposed to leave open a small fill gate to allow 0.05 cfs to flow into the power canal, water quality certification is required here.[87]  We disagree.  Aclara's proposal to keep the power canal watered, as it had been under the license, does not constitute a new discharge under the meaning of the Clean Water Act and does not require water quality certification.[88]

## III.   Conclusion

35.    Based on the foregoing, we sustain the conclusion from the Surrender Order that approval of Aclara's surrender proposal without requiring dam removal was in the public interest, not arbitrary and capricious, and is not in violation of the Clean Water Act.

The Commission orders:

In response to American Whitewater's request for rehearing, Commission staff's May 22, 2023 Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.

( S E A L )




Debbie-Anne A. Reese,
Deputy Secretary.

---

[86] Rehearing Request at 21.

[87] *Id.* at 21-22.

[88] *See N.C. v. FERC*, 112 F.3d 1175, 1188 (D.C. Cir. 1997) (finding that certification was not required to amend a license because "[o]n the evidence of record, the operation of the Pipeline Project will not result in the 'addition' of anything to the waters of Lake Gaston").  *Compare with Ala. Rivers Alliance v. FERC*, 325 F.3d 290, 299-300 (D.C. Cir. 2003) (stating that a proposed amendment that "reduces—and thus simply alters—a discharge" does not require certification; however, a proposed amendment that "increases a discharge poses a distinct risk," and therefore certification is required).  Aclara's proposed decommissioning activities would not result in the "addition" of anything to the river and would not "increase" discharge to the river.

**Attachment D: Request for Rehearing**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Aclara Meters, LLC                                    Project No.  3820-012

REQUEST FOR REHEARING OF AMERICAN WHITEWATER OF THE
FEDERAL ENERGY REGULATORY COMMISSION'S ORDER APPROVING
SURRENDER OF LICENSE FOR THE SOMERSWORTH PROJECT
(FERC NO. P-3820)

Pursuant to 18 C.F.R. § 385.713, American Whitewater requests rehearing of the Federal Energy Regulatory Commission's ("Commission") May 22, 2023 Order Approving Surrender of License for the Somersworth Project No. 3820. American Whitewater seeks rehearing on the grounds that the Commission's Order is not in the public interest, is arbitrary and capricious, and fails to comply with Section 401(a)(1) of the Clean Water Act. On September 27, 2019, American Whitewater filed Motion to Intervene and Comments on License Surrender Application for the Somersworth Project (Accession No. 201909275052).

I.
BACKGROUND

    American Whitewater is a national non-profit 501(c)(3) river conservation and recreation organization founded in 1954. We have approximately 7,000 members and over 100 affiliate organizations, representing tens of thousands of whitewater paddlers across the nation. American Whitewater's mission is to protect and restore our nation's whitewater resources and to enhance opportunities to enjoy them safely.

    The Salmon Falls River flows south and defines a portion of the state border between Somersworth, New Hampshire and Berwick, Maine. The section of the river impacted by the project has the potential to offer recreational boating opportunities. Our members are primarily conservation-oriented kayakers, rafters and canoeists, and many of them live within a short driving distance from the Salmon Falls River and would enjoy recreating on the section that is currently impacted by the Project, and therefore we have an interest in the outcome of this proceeding.

    In 2016, the licensee filed a NOI/PAD and commenced the relicensing process, although the project has not operated since 2011 due to a penstock failure. Ultimately, the licensee decided to decommission the project, and on March 29, 2019 filed an application with FERC for license surrender. Following Aclara's surrender application, New Hampshire Renewable Resources ("NHRR") filed a Notice of Intent/Pre-Application Document on July 25, 2019 seeking the transfer of the project license and resumption of hydroelectric power generation notwithstanding the failure of the project penstock and its

lack of ownership or control over project facilities. NHRR subsequently abandoned its effort to take over the project license and the licensee has resumed its effort to decommission the project.

The Somersworth Project includes two dams. The upper dam, referred to as "Stone Dam," impounds and redirects natural river flow to a canal and penstock used for generation and other purposes. The lower dam is a low-head dam that is referred to as "Back Dam" and is located within the bypassed reach/natural channel of the river. While the licensee proposes to decommission the project, it has no plans to remove either Stone Dam or Back Dam. The licensee states that it intends to "offer to sell Stone Dam to City of Somersworth and/or Town of Berwick as both entities withdraw water from the impoundment. In doing so, Aclara is attempting to shift liability for future dam maintenance costs to local taxpayers.

The continued presence of these dams will continue to obstruct fish passage, degrade water quality, eliminate recreation opportunities, and jeopardize public safety. Both Stone Dam and Back Dam disrupt river connectivity and impede safe, timely and effective fish passage. Project decommissioning without removal of the Stone and Back Dam will disrupt natural river function. With regard to recreation, the dams create an exceptional hazard to life and present a complete obstruction to passage of the river by recreational boaters with no practical means of portage. The removal of these dams would restore the natural river function, restore river connectivity, allow aquatic species to access upstream habitat, and create meaningful recreational opportunities.

## II.
## STATEMENT OF ISSUES

**Issue 1:** **Did the Commission Err in Failing to Determine that Dam Removal is in the Public Interest?**

**Issue 2:** **Did the Commission Err by Arbitrarily and Capriciously Rejecting the Dam Removal Alternative?**

**Issue 3:** **Did the Commission Err by Failing to Comply with Section 401(a)(1) of the Clean Water Act?**

## III.
## ARGUMENT

**1. The Commission's Order Approving Surrender of License is Not in the Public Interest**

   a. Public Interest Standard

Under the Federal Power Act, "Licenses may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission after thirty days' public notice." 16 U.S.C. §799. Federal regulations provide that "Every application for surrender of a license shall state the reason therefore; and, except in the case of an application for surrender of a license for a minor project … shall be executed by the licensee and filed in the same form and manner as the application for license, and shall be accompanied by the license and all amendments thereof. Public notice of such application shall be given at least 30 days prior to action upon the application." 18 C.F.R. §6.1. FERC regulations further provide that "Licenses may be surrendered only upon the fulfillment by the licensee of such obligations under the license as the Commission may prescribe, and, if the project works authorized under the license have been constructed in whole or in part, upon such conditions with respect to the disposition of such works as may be determined by the Commission. 18 C.F.R. §6.2.

In requiring an orderly transition of hydropower projects following decommissioning, FERC uses a broad public interest standard derived from governing statute (16 USC §799) and regulations (18 CFR §§6.1 and 6.2), as articulated in both the Commission's Project Decommissioning at Relicensing; Policy Statement (hereinafter Decommissioning Policy Statement). FERC's Decommissioning Policy Statement states:

> The Commission is of the opinion that implicit in the section 6 surrender provision is the view that a licensee ought not to be able simply to walk away from a Commission-licensed project without any Commission consideration of the various public interests that might be implicated by that step. Rather, the Commission should be able to take appropriate steps that will satisfactorily protect the public interests involved. [1]

FERC's license surrender decisions similarly apply a broad public interest standard. See, *Erie Boulevard Hydropower, L.P., Saint Regis Mohawk Tribe,* 155 FERC P62,243, 64,628 (2016), citing *Arizona Pub. Serv. Co.,* 109 FERC P 61,036 at p 34 (2004). Accordingly, under both FERC policy and decisions, FERC has concluded that it has the power to take steps necessary to assure that the public interest is suitably protected, in some cases requiring removal of the project dam.

Numerous other FERC licensed projects have resulted in dam removal including the Dillsboro Project (P-2602) and Sullivan Creek Project (P-2225) where significant whitewater recreation issues were affected. In the Surrender Order rendering the decision to remove the dam at the Dillsboro Project, the Commission noted the significant public benefits, among them "the resulting free flow of the river will also improve recreational

---

[1] *Project Decommissioning at Relicensing; Policy Statement*, 60 Fed. Reg.339 (Jan. 4, 1995), 18 C.F.R.§2.24.

opportunities for whitewater boating and riverine angling."[2] Likewise, FERC required the removal of the Mill Pond Dam at the Sullivan Creek Project following the surrender of the project by Pend Oreille PUD. The decommissioning order and associated plans included measures for dam removal and site restoration; they also included recreational enhancement to achieve the overall project goal to "improve native fish populations and improve sustainable recreation in Sullivan Creek by reducing adverse effects to the creek."[3] While the Commission's Order at issue in the Somersworth Project notes that "the two projects mentioned by American Whitewater in comments, i.e., the Dillsboro and Sullivan Creek Projects, are projects where the Commission required dam removal and recreation measures only because the licensees in those proceedings proposed them as part of the proposed action", FERC's authority to require removal of dam structures is not contingent upon the licensee's agreement.

b.   Dam Removal is in the Public Interest

The Somersworth Project is located on the Salmon Falls River and borders Somersworth, New Hampshire and Berwick, Maine. Downstream of the Somersworth Project are three other Commission-licensed projects:  Lower Great Falls Hydroelectric Project No. 4451, the Rollinsford Hydroelectric Project No. 3777, and the South Berwick Hydroelectric Project No. 11163.  Approximately 9 miles upstream is the Boston Felt Project No. 4542, an exemption under the Commission's jurisdiction.

The Somersworth Hydroelectric Project includes two dams--Stone Dam and Back Dam– that impound and redirect natural river flow to a canal and penstock used for generation before returning diverted flows to the river below the powerhouse. The diversion dewaters a  2,200-foot section of the Salmon Falls River leaving a paltry 10 cfs in the bypassed reach between Stone Dam and the powerhouse tailrace, a flow insufficient to support aquatic habitat or recreation. Back Dam is located just above the powerhouse tailrace and serves to allow the licensee to divert nearly all river flows for generation, avoid providing meaningful aquatic flows to the river below Stone Dam, and prevent fish from accessing the bypassed reach. Back Dam is obsolete, eliminates the possibility of recreational activities on the river because it creates an exceptional hazard to life, and forms a complete obstruction to passage of the river with no practical means of portage.

---

[2] At Paragraph 17, Page 9, Order accepting surrender and dismissing application for subsequent license re Duke Energy Carolinas, LLC's Dillsboro Project under P-2602, July 19, 2007, 120 FERC ¶ 61,054, <https://elibrary.ferc.gov/idmws/search/intermediate.asp?link_file=yes&doclist=13524207>

[3] At Page ES1, Sullivan Creek Recreation Site Restoration Final Plan for Seattle City Light under P-2144, December 2017, Accession Number 20191004-5165 <https://elibrary.ferc.gov/idmws/search/intermediate.asp?link_file=yes&doclist=14804167>

Stone Dam is 400 feet long and 16.5 feet high, with a spillway crest elevation of 42.5 feet mean sea level (msl); a gatehouse with three intakes leading to a 1,600-foot-long block and stone-lined canal; a 600-foot-long, 10-foot diameter underground penstock leading to two turbine generators with a hydraulic capacity of 130 cfs. The second dam, Back Dam, is a non-hydroelectric dam and is located immediately upstream of the powerhouse tailrace. Back Dam is 107 feet long and 19 feet high, and the upper portion is constructed of concrete, while the base is assumed to be rock-filled. Back Dam serves no project purpose. The Somersworth Project is currently non-operational and has been offline since June 26, 2011 due to a leaking penstock.

Aclara filed a Pre-application Document on August 31, 2016 commencing relicensing of the Somersworth Project. Prior to filing its Final License Application, Aclara filed with the Commission on March 29, 2019 an application to surrender its license due to the costs associated with relicensing and rehabilitating the penstock. In its surrender application, Aclara proposed the following measures:

- Leave the stoplogs down at the forebay permanently.
- Leave the cofferdam, just prior to the entrance to the trashrack and penstock, in its current location.
- Remove the trashrack.
- Disconnect the power supply to the forebay at the power source located on Aclara's premises.
- Remove the trashrack and gear from the forebay area.
- Fill the forebay with sand backfill material.
- Fill the penstock with sand.
- Remove all hydraulic fluids from the powerhouse.
- Disconnect the generator and switch gear.
- Remove all electrical equipment (cabinets) from the powerhouse.
- Close all gates at the gatehouse and keep only the fill gate (2' x 2'), which is used to re-water the power canal, open to provide Aclara's processing water (25,000-30,000 gallons per day = 0.05 cfs).
- Maintain the current bypass gate integrity at the current condition and level. The bypass gate would remain open to pass the current minimum flow of 10 cfs. The invert of this gate is below the crest of the Stone Dam.
- All inflow would be passed over the spillway or through the bypass gate with the exception of the 0.05 cfs of processing water for Aclara's operations.
- Maintain brush control on each side of the canal. The canal would remain watered for Alcara's processing flow.
- Offer to sell Stone Dam to the City of Somersworth and/or the Town of Berwick

5

as both entities withdraw water from the impoundment.

While the licensee proposes to decommission the project, it has no plans to remove either Stone Dam or Back Dam. The licensee states that it intends to "offer to sell Stone Dam to City of Somersworth and/or Town of Berwick as both entities withdraw water from the impoundment," but has no commitment from either entity to take over responsibility for the dams. Aclara is seeking to walk away from and shift liability for future dam maintenance costs to local taxpayers. Additionally, the presence of these dams will obstruct both upstream and downstream fish passage.

Fish passage for American shad and river herring is currently provided at the South Berwick Dam through a combined upstream Denil fish ladder and downstream bypass facility that was installed in 2002. Diadromous fish passage on the Salmon Falls River is blocked by the two dams at the Somersworth Project as well as by the two projects immediately downstream--the Lower Great Falls (P-4451) and Rollinsford (P-3777) hydroelectric projects. Currently, these facilities are complete barriers for American shad (Alosa sapidissima), alewife (Alosa pseudoharengus), and blueback herring (Alosa aestivalis), and a partial barrier to American eel (Anguilla rostrata).

In comments by the New Hampshire Fish & Game Department, and echoed by New Hampshire Department of Environmental Services, Maine Department of Marine Resources, and U.S. Fish & Wildlife Service, the resource agencies expressed concern that the Somersworth dams' presence blocks diadromous passage of fish up the Salmon Falls River, particularly if and when passage is provided at the downstream Rollinsford and Lower Great Falls Projects. FERC staff's rejection of dam removal as an alternative in its January 6, 2021 Environmental Assessment was based, in part, on the presence of downstream dams at Lower Great Falls and Rollinsford that block and limit most upstream passage, except for American eel.

`Subsequent to the issuance of the EA, the USFWS entered into a Settlement Agreement with the licensees for those projects on January 31, 2021 that provides for fish passage at the Rollinsford and Lower Great Falls projects either through construction of a permanent volitional fishway or through a trap-and-truck operation at South Berwick. Under the terms of the Settlement Agreement, the trap-and-truck operation will cease once a fishway is constructed, potentially in 2032. These fishway prescriptions were incorporated into the licenses for the Rollinsford and Lower Great Falls projects that were issued subsequent to the EA.

In general, the Settlement Agreement includes provisions for interim trap and truck upstream passage of the anadromous American shad, alewife, and blueback herring with distribution above the Rollinsford and Lower Great Falls projects. The Settlement Agreement requires the construction of volitional fishways after 10 years, or in the possible continuation of the trap-and-truck operation at those projects for the term of the

licenses. The recently issued FERC licenses for those projects incorporated the Settlement Agreement requirements for fish passage.

As a result of the Settlement Agreement, anadromous fish runs in the Salmon Falls River will reach the Somersworth Project in the reasonably foreseeable future. Removal of the passage barriers at the Somersworth Project would provide access up to the Boston Felt Hydroelectric Project (P-4542) approximately 9-miles upstream, tripling the accessible habitat and providing 192 acres of habitat for priority "at-risk" species in the Salmon Falls River. USFWS requested that the final EA for the Somersworth Project consider dam removal as an alternative to the Aclara's proposed action and consider the ecological and socioeconomic effects restoring Salmon Falls River anadromous fish runs will have when evaluating the proposed action.

The construction of downstream fishways at Rollinsford and Lower Great Falls will leave the two dams at the Somersworth Project--Stone Dam and Back Dam—as complete barriers to fish passage on the Salmon Falls River preventing attainment of restoration goals for shad and blueback herring on the Salmon Falls River, permanently cutting off access to nine miles of upstream habitat above the Somersworth Project. Allowing the licensee to walk away from the project without requiring removal of project dams disrupts river connectivity, prevents safe, timely and effective fish passage, impedes natural river function by reducing water quality, and eliminates valuable recreational boating opportunities that would otherwise exist but for the presence of these dams. The presence of dam structures creates an exceptional hazard to life and presents a complete obstruction to passage of the river with no practical means of portage. Low-head dams are inherently dangerous as they pose significant safety hazards for boaters, tubers, and swimmers who can easily drown below these structures and recirculating flows can prevent escape.



*Photo 1: Stone Dam under normal conditions*



*Photo 2: Back Dam under normal conditions*

The licensee claims in its Pre-application Document: "The region between Back Dam and Stone Dam is not suitable for boaters. During the summer period, flows are too low to operate the hydropower project and all water is spilled at the Stone Dam, yet there is still insufficient flow to paddle or boat the bypass reach." The licensee's claim that the river is unsuitable for boating, however, is based on the presence of its own abandoned structures. While the licensee asserts that flows are too low for boating on the Salmon Falls River in the summer, ample flows are present at other times of the year.

**Table 4.3.1-1: Mean, Median, Maximum and Minimum Flows at the Stone Dam**

(based on prorating flow at USGS Gage on Salmon Falls River at Milton, NH for the period 1968-2005)

| Statistic | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Ann |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Flow (cfs) | 45 | 59 | 80 | 80 | 55 | 51 | 35 | 33 | 29 | 29 | 41 | 45 | 29 |
| Maximum Flow (cfs) | 3,069 | 3,379 | 6,589 | 6,569 | 4,379 | 4,686 | 1,711 | 1,035 | 2,030 | 4,891 | 2,517 | 3,786 | 6,589 |
| Median Flow (cfs) | 301 | 294 | 477 | 764 | 377 | 176 | 92 | 84 | 86 | 301 | 358 | 358 | 272 |
| Median per mi$^2$ (cfsm) | 1.36 | 1.33 | 2.16 | 3.46 | 1.70 | 0.80 | 0.42 | 0.38 | 0.39 | 1.36 | 1.62 | 1.62 | 1.23 |
| Mean Flow (cfs) | 353 | 363 | 619 | 900 | 475 | 279 | 133 | 128 | 154 | 366 | 401 | 463 | 388 |
| Mean per mi$^2$ (cfsm) | 1.60 | 1.64 | 2.80 | 4.07 | 2.15 | 1.26 | 0.60 | 0.58 | 0.70 | 1.66 | 1.81 | 2.09 | 1.75 |

*Figure 1: Table: Historical flows on Salmon Falls River provided in PAD*

The removal of Stone Dam and Back Dam would create meaningful opportunities for recreational boating in the project area and open the reach between Boston Felt and Lower Great Falls to recreational boating. With the removal of the lower dam and restoration of flows, this section of the river could be restored to a more natural state and become an asset to the community. Any plan for surrender of Aclara's FERC license must include measures that will restore recreation opportunity in the project boundary.

**2. The Commission's Rejection of Dam Removal Alternative was Arbitrary and Capricious**

a. Resource Agency and Stakeholder Issues

8

The Commission's Order Approving Surrender of License violated the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*. ("APA") and is unsupported by substantial evidence and is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A). Under the FPA, the Commission's factual findings underlying the Order must be "supported by substantial evidence." 16 U.S.C. § 825*l*(b). See, also, *Bangor Hydro-Electric Co. v. FERC,* 78 F.3d 659, 663 & n. 3 (D.C.Cir.1996).

FPA section 313(b) provides that "the finding of the Commission as to the facts, if supported by substantial evidence, shall be   conclusive." 16 U.S.C. § 825*l*(b). Under this standard, the Commission "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record." *N. States Power Co. v. F.E.R.C.,* 30 F.3d 177, 180 (D.C. Cir. 1994) (internal quotations omitted). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bear Lake Watch, Inc. v. F.E.R.C.*, 324 F.3d 1071, 1076 (9th Cir. 2003) (quoting *Eichler v. S.E.C.*, 757 F.2d 1066, 1069 (9th Cir. 1985)). Substantial evidence equates to "more than a mere scintilla[,] but less than a preponderance." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quotation and citation omitted).

Further, the Commission must address competing "competent and relevant evidence" when rendering its decision: "While FERC is the fact-finder, it cannot "arbitrarily ignore[ ]" "unrebutted, legally significant evidence" or "base [its] decision on only isolated snippets of that record while disregarding the rest." *N. Carolina Dep't of Env't Quality v. Fed. Energy Regul. Comm'n*, 3 F.4th 655, 672 (4th Cir. 2021) (quoting *Baharon v. Holder,* 588 F.3d 228, 233 (4th Cir. 2009); *see also Genuine Parts Co. v. EPA*, 890 F.3d 304,312 (D.C. Cir. 2018).

Similarly, under the APA, 5 U.S.C. §706(2)(A), the Commission's decision is arbitrary and capricious if the agency, *inter alia*, "relied on factors which Congress has not intended it to consider"; "entirely failed to consider an important aspect of the problem"; or failed to support its factual conclusions with substantial evidence in light of the record as a whole." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 48-51 (1983) (*Motor Vehicle Mfrs.*). The Commission must therefore, in its orders, "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Pub. Utilities Comm'n of State of Cal. v. F.E.R.C.*, 462 F.3d 1027, 1048 (9th Cir. 2006) (quoting *Motor Vehicle Mfrs.,* 463 U.S. at 43).

FERC's surrender order is arbitrary and capricious because it fails to take a hard look at or consider dam removal as an alternative to the licensee's surrender plan without any meaningful analysis. NEPA requires that agencies take a "hard look" at the environmental effects of their planned action. *Marsh* v. *Oregon Natural Resources*

9

*Council,* 490 U.S. 360, 374 (1989) Additionally, Council on Environmental Quality Regulations require that FERC "[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination." 40 CFR Parts 1502.14

American Whitewater, various resource agencies, and others filed comments, in response to Aclara's request for stakeholder input on its surrender application and subsequently in response to FERC's Environmental Assessment, requesting that the licensee and FERC evaluate a dam removal alternative to the proposed surrender plan. Significantly, stakeholders cited the impact of the Somersworth project dams on safe, timely, and effective fish passage for American Shad, blueback herring, and American Eel. While passage for these fish species is currently blocked by downstream dams at Rollinsford and Lower Great Falls, passage at those facilities has been addressed by the recent relicensings and Settlement Agreement for those projects. In comments to FERC's Environmental Assessment, USFWS stated the following:

> Therefore, it is likely that anadromous fish runs in the Salmon Falls River will reach the Somersworth Project in the reasonably foreseeable future. Removal of the passage barriers at the Somersworth Project would provide access to the Boston Felt Hydroelectric Project (P-4542) approximately 9-miles upstream, tripling the accessible habitat and providing 192 acres of habitat for priority "at-risk" species in the Salmon Falls River. For these reasons, we respectfully request the final EA consider dam removal as an alternative to the proposed action and consider the ecological and socioeconomic effects restoring Salmon Falls River anadromous fish runs will have when evaluating the proposed action.

Comments filed by Maine Department of Inland Fisheries & Wildlife, Maine Department of Environmental Protection, Trout Unlimited Sebago Lake Chapter, and Trout Unlimited Great Bay Chapter all supported comments by USFWS given the impact of project dams on diadromous and resident fish species and river connectivity. Similarly, comments filed by New Hampshire Fish & Game Department state the following:

> For these reasons, it is unacceptable that the EA further concluded that dam removal or additional fish passage prescriptions were eliminated as an alternative to the proposed action resulting in the lack of assessment the surrender would cause to diadromous fish species. The Department hereby strongly recommends and respectfully requests that the final EA consider dam removal and/or fish passage prescriptions as an alternative to the proposed action and consider the ecological and socioeconomic effects restoring Salmon Falls River anadromous fish runs will have when evaluating the proposed action.

10

In comments to Aclara in response to the proposed surrender plan, FERC's environmental assessment, and Motion to Intervene in Aclara's surrender application, American Whitewater echoed concerns about the lack of fish passage due to the presence of Stone Dam and Back Dam. Additionally, American Whitewater's comments objected to the surrender plan based on the impact of project dams on recreational boating due to the lack of portage, the public safety risk of allowing obsolete and deteriorating low-head dams to remain in the river, and the lack of any plan addressing responsibility for future dam maintenance, public safety, and environmental impacts of any remaining project facilities. While Aclara's plan to surrender its project license without addressing the harmful environmental effect of abandoning Stone Dam and Back Dam was opposed by federal and state resource agencies and NGO stakeholders, the City of Somersworth opposed dam removal based on the use of waters in the project reservoir for drinking water, sewage treatment, and fire suppression.

   b.   Failure to Consider Dam Removal Alternative

Notwithstanding the overwhelming support for consideration of dam removal by federal and state resource agencies as well as by NGO stakeholders to restore the river to benefit aquatic and recreation resources, the Commission's Order relies on the Environmental Assessment, which incongruously concludes the following:

> Since no ground disturbance is proposed, the EA found that the proposal would have no effects on geology and soils, water quantity, water quality, and terrestrial resources (including wildlife and botanical resources). The EA also found that the proposed surrender would have no effect on fisheries or recreation.

While USFWS requested that FERC analyze the effect of dam removal on water supply and how those effects could be mitigated, FERC dismisses that request without explanation, stating, "we agree with the licensee that further evaluation is unnecessary for the purposes of this surrender."

The Commission's Order Approving Surrender of License fails to devote even a single sentence to explaining its rationale for rejecting the dam removal alternative supported by every stakeholder other than the City of Somersworth. The sole paragraph devoted to weighing the various considerations offers only conclusory statements without any explanation of its rational, stating:

> Weighing these existing uses of the reservoir, the location of the project dams, the anticipated effects of surrender of the license as proposed, as well as the anticipated effects of dam removal, we find that dam removal is not warranted as part of surrender of this license. Therefore, although our Decommissioning Policy Statement affirms the weighing these existing

11

uses of the reservoir, the location of the project dams, the anticipated effects of surrender of the license as proposed, as well as the anticipated effects of dam removal, we find that dam removal is not warranted as part of surrender of this license.   Therefore, although our Decommissioning Policy Statement affirms the Commission's statutory power, in rare instances, to require the removal of a project dam, it would not be in the public interest to do so here.

These conclusory statements are a far cry from the "hard look" required by *Marsh v. Oregon Natural Resources Council*. Similarly, In *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 851 (D.C. Cir. 1970), the D.C. Circuit held:

> The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts, a course that tends to assure that the agency's policies effectuate general standards, applied without unreasonable discrimination. As for the particular subject of comparative hearings, the findings must cover all the substantial differences between the applicants and the ultimate conclusion must be based on a composite consideration of the findings as to each applicant.

The Court articulated and explained the "hard look doctrine" as a way for courts to give meaning to the arbitrary and capricious standard in reviewing federal administrative agency actions, holding that the "supervisory function calls on the court to intervene...if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making." Id. In failing to articulate with reasonable clarity the basis for its rejection of the dam removal alternative including a weighing of the relative importance of various considerations and exploring reasonable mitigation for detrimental effects, the Commission has failed to meet its minimum obligation for reasonable decisionmaking.

Rather than taking a hard look at dam removal, the Commission instead provides a boilerplate recitation of easily distinguishable and/or incorrectly decided orders in which it declined to require dam removal as an alternative to relicensing or the licensee's surrender plan.[4] For example, in *Rochester Gas & Electric*, the Commission rejected a

---

[4] *See e.g.*, *Pub. Util. Dist. No. 1 of Okanogan County*, 169 FERC ¶ 61,215, at P 18 (2019) (explaining that a licensee should not be required to remove or modify structures that it did not build pursuant to its license); *Great Bear Hydropower, Inc.*, 156 FERC ¶ 62,113, at P 4 (2016) (delegated order) (permitting surrender where the licensee removes hydroelectric facilities but leaves the state to perform any future dam removal); *VC Porterdale Hydroelectric, LLC*, 153 FERC ¶ 62,261 (2015) (delegated order) (refusing to require removal of the dam where the

12

dam removal as an alternative; however, that case involved a surrender where the Commission determined there are few, if any, environmental benefits to be gained from removal of the dam. By contrast, at Somersworth there is substantial evidence of the beneficial effect of dam removal. While the Commission concedes that it has the authority to require dam removal where appropriate, the Commission's authority is not contingent upon the agreement of the licensee as the order seems to imply.

The Commission's Order also addressed the potential impact of the surrender on historical properties. On November 26, 2018, the Maine SHPO indicated that no effect on historic properties would result from surrender of the project. The eligibility for listing the project features on the National Register of Historic Places has not been determined. Notwithstanding a complete lack of information on which to base its determination of potential historic significance, FERC concludes that the proposed surrender would adversely affect the potential eligibility for listing historic project features because of a loss of federal jurisdiction. FERC based its determination solely on the fact that the structure may be more than 50 years old. Under that standard, every dam decommissioning would affect eligibility for listing on the National Register because as a practical matter every decommissioned dam is more than 50 years old. Without any evidence of historic value or proof that the City of Somersworth or the Town of Berwick intend to take over responsibility for dam maintenance, FERC's conclusion regarding the potential impact on historic structures is unsupported by any evidence of the impact of the surrender on historical resources. It is likely that these structures will eventually result in demolition by neglect, a concern raised by New Hampshire Division of Historical Resources, and will eventually become yet another littered remnant of mill dams found throughout New England.

### 3. The Commission's Order Approving Surrender of License Violates Section 401(a)(1) of the Clean Water Act

Section 401(a)(1) of the Clean Water Act requires that any applicant for a federal license or permit proposing to conduct "any activity…which may result in any discharge into the navigable waters" must obtain a certification from the state or tribe in which the discharge originates ensuring that the discharge will comply with various provisions of the Clean Water Act. The certification can include conditions necessary to ensure that the permit will comply with the state or tribal water quality standards or other appropriate

---

benefits of restoring the river to its original state were outweighed by the significant historic, social, and aesthetic benefits of the dam to the community at large); *Rochester Gas & Electric*, 99 FERC ¶ 61,012, at 61,040, *on reh'g*, 100 FERC ¶ 61,113, at 61,447 (2002) (refusing to require dam removal that could result in adverse impacts to water quality and downstream fishery resources); *Pub. Serv. Co. of N.H.*, 75 FERC ¶ 61,111, at 61,382 (1996) (refusing to require dam removal due to impacts on recreation, economics, and the environment)

requirements of state or tribal law. "No license or permit shall be granted until the certification required by this section has been obtained or has been waived…." 33 U.S.C. §§1341(a)(1).

The definition of what constitutes a discharge was settled by the Supreme Court in *S.D. Warren v. Maine Board of Environmental Protection Agency et al,* 547 U.S 370 (2006). According to the unanimous decision authored by Justice Souter, the term discharge is to be broadly defined and given its common and ordinary meaning. The unanimous opinion stated:

> When it applies to water, "discharge" commonly means a "flowing or issuing out," Webster's New International Dictionary 742 (2d ed. 1954); see also *ibid.* ("[t]o emit; to give outlet to; to pour forth; as, the Hudson *discharges* its waters into the bay"), and this ordinary sense has consistently been the meaning intended when this Court has used the term in prior water cases. See, *e. g., <u>Marsh v. Oregon Natural Resources Council,</u> 490 U. S. 360, 364 (1989)* (describing a dam's "`multiport' structure, which will permit discharge of water from any of five levels"); *<u>Arizona v. California,</u> 373 U. S. 546, 619, n. 25 (1963) (Harlan, J., dissenting in part)* (quoting congressional testimony regarding those who "`take . . . water out of the stream which has been discharged from the reservoir'"); *<u>United States v. Arizona,</u> 295 U. S. 174, 181 (1935)* ("Parker Dam will intercept waters discharged at Boulder Dam"). *Id.* At 376.

On September 29, 1981, FERC issued a license to General Electric Company to construct and operate the Somersworth Project. Article 26 of the project license reads as follows:

> *Article 26.* Licensee shall **discharge** from Stone Dam at all times a continuous minimum flow of 10 cubic feet per second (cfs). Further, Licensee shall discharge a continuous minimum flow of 110 cfs, or a flow equal to the inflow to the reservoir, whichever is less, as measured at a point immediately downstream from the powerhouse. These flows may be temporarily modified if required by operating emergencies beyond the control of the Licensee, and for short periods for fishery management purposes upon mutual agreement between the Licensee, the New Hampshire Fish and Game Department, and the Maine Department of Inland Fisheries and Wildlife. (emphasis added)

While Aclara artfully avoids the use of the word "discharge" in its surrender application, Article 26 of its current FERC license appropriately characterizes as a discharge the 10 cfs outflow from Stone Dam as well as the 110 cfs flow below the powerhouse. Currently, Aclara passes the required 10 cfs discharge from its bypass gate at Stone Dam. Additionally, Aclara plans to divert flow from the Salmon Falls River through a fill gate to rewater the power canal to provide processing water for its manufacturing operations, stating the following in its surrender application:

- Maintain the current bypass gate integrity at the current condition and level. The bypass gate would remain open to pass the current minimum flow of 10 cfs.  The invert of this gate is below the crest of the Stone Dam.

- Close all gates at the gatehouse and keep only the fill gate (2' x 2'), which is used to re-water the power canal, open to provide Aclara's processing water (25,000-30,000 gallons per day = 0.05 cfs).



Bypass Gate
- Bypass gate would remain open to pass current minimum flow of 10 cfs.  0 gal/day (30,000 gpd= 0.05 cfs).  The invert of this gate is below the crest of the dam.
- All inflow would be passed over the spillway or through the bypass gate with the exception of the 0.05 cfs of processing water.

*Photo 3: Stone Dam Bypass Gate shown in surrender application.*

Both the bypassed reach flow of 10 cfs passed through bypassed gate at Stone Dam and the flow diversion through the "fill gate" are discharges within the meaning of Section 401(a)(1) of the Clean Water Act sufficient to trigger New Hampshire and Maine's Section 401 authority. Both Maine and New Hampshire exercised their 401 authority at the Rollinsford and Lower Great Falls projects that were recently relicensed. Both certifying agencies have demonstrated strong interest in the restoration of the Salmon Falls River.

The Commission's Order Approving Surrender of License fails to make any mention of Section 401 and fails to analyze whether the surrender plan triggers a Section 401 review by Maine and New Hampshire. Nevertheless, FERC has acknowledged the applicability of Section 401 in surrender proceedings, stating that " [n[ot all applications to surrender a licensed project require a water quality certification because certification is required only in connection with an application for a license or permit to conduct any activity that may result in a discharge*." Pacific Gas and Electric*, 170 FERC ¶ 61,232 (2020). *See, e.g.*, *Rochester Gas and Electric Corp.*, 100 FERC ¶ 61,113, at P 17 (2002). Neither the EA nor the Commission's order addresses whether the bypassed reach flow or Aclara's withdrawal of processing water are discharges, or whether the Aclara's diverted processing water will be released back into the Salmon Falls River.

*Rochester Gas and Electric Corp.* concerned a surrender where the licensee proposed to place concrete bulkheads in the intake stoplog area to prevent the passage of water to the turbines. The staff-recommended additional measures involved locking or sealing doors and gates, covering or protecting windows, and removing toxic materials from the powerhouse to protect water quality. The Commission found that none of these activities would "result in a discharge" within the meaning of Section 401(a)(l) of the CWA.

While the Somersworth Project surrender includes many similar provisions to those identified in the *Rochester Gas and Electric Corp.* surrender, Somersworth, by contrast, includes additional provisions for the minimum flow diversion through the bypass gate as well as the diversion of flows through the 2x2 fill gate to rewater the power canal and provide Aclara with processing water for its manufacturing operation. These provisions distinguish the Somersworth surrender from *Rochester Gas and Electric Corp* and are discharges within the meaning of Section 401(a)(1).

Although these discharges may be small, the Clean Water Act creates no *de minimis* exception that allows the Commission to issue a surrender order without complying with Section 401. Compliance with Section 401 is mandatory when "any activity…may result in any discharge." The words "any" are not qualified and are therefore inclusive without exception. For this reason, the Commission's Order Approving Surrender of License must be vacated and the licensee informed that that under Section 401(a)(1), "[n]o license or permit shall be granted until the certification required by this section has been obtained or has been waived…."

## IV.
## REQUEST FOR RELIEF

For the reasons outlined above, American Whitewater requests that the Commission vacate the May 22, 2023 Order Approving Surrender of License by Aclara Meters, LLC for the Somersworth Project. American Whitewater requests that the

16

Commission evaluate the dam removal alternative in accordance with the National Environmental Policy Act and Federal Power Act, and in addition, require the licensee to comply with Section 401 of the Clean Water Act.

Respectfully submitted this 20th day of June, 2023.

Robert A. Nasdor
Northeast Stewardship & Legal Director
American Whitewater
65 Blueberry Hill Lane
Sudbury, MA 01776

**Attachment E: Service List for FERC Docket P-3820**

## Service List for P-3820-000 General Electric Company

Retrieved 10/19/2023 from https://ferconline.ferc.gov

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Aclara Meters LLC | | Susan Montross<br>Vice President, Meters Global<br>130 Main Street<br>Somersworth, NEW HAMPSHIRE 03878<br>smontross@aclara.com |
| American Municipal Power, Inc. | Lisa McAlister<br>Deputy General Counsel - FERC/<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>UNITED STATES<br>lmcalister@amppartners.org | Gerit F. Hull<br>Deputy General Counsel - Regul<br>American Municipal Power, Inc.<br>1111 SCHROCK RD STE 100<br>COLUMBUS, OHIO 43229<br>ghull@amppartners.org |
| American Municipal Power, Inc. | | Christopher J Norton<br>Director of Market Regulatory<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>cnorton@amppartners.org |
| American Whitewater | Robert Nasdor<br>NE Stewardship & Legal Dir.<br>American Whitewater<br>65 Blueberry Hill Ln.<br>Sudbury, MASSACHUSETTS 01776<br>UNITED STATES<br>bob@americanwhitewater.org | |
| Boston Energy Trading and Marketing LLC | Michael Blasik<br>Diamond Generating Corporation<br>1 International Place<br>Suite 910<br>Boston, MASSACHUSETTS 02110<br>UNITED STATES<br>m.blasik@dgc-us.com | Tyler Ballew<br>Boston Energy Trading and Marketing LLC<br>1 INTERNATIONAL PL STE 910<br>BOSTON, MASSACHUSETTS 02110<br>t.ballew@dgc-us.com |

1

| | | |
|---|---|---|
| City of Somersworth, NH | Gary Lemay<br>City Engineer<br>City of Somersworth, NH<br>1 Government Way<br>Somersworth, NEW HAMPSHIRE 03878<br>UNITED STATES<br>glemay@somersworth.com | |
| New Hampshire Renewable Resources LLC | Paul Nolan<br>Energy Consultant<br>Hydro Power, Inc.<br>5515 17th Street North<br>Arlington, VIRGINIA 22205-2722<br>UNITED STATES<br>pvnpvndiver@gmail.com | |